## KEN–RAD CORPORATION v. R. C. BOHAN-NAN, Inc.

### No. 6790.

Circuit Court of Appeals, Sixth Circuit.

Dec. 3, 1935.

T. E. Sandidge, of Owensboro, Ky., and Lawrence D. Stanley, of Columbus, Ohio (Henderson, Burr, Randall & Porter, of Columbus, Ohio, and Sherman B. Randall, of Columbus, Ohio, on the brief), for appellant.

George E. Landis and Luther L. Boger, both of Columbus, Ohio, for appellee.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The controversy is as to the validity of an alleged contract between a manufacturer of radio tubes and a distributor thereof in definitely assigned territory, and as to the respective rights and obligations of the parties to the contract, if valid. The plaintiff below was Bohannan, Inc., the distributor, and the suit was against the Ken-Rad Corporation, the manufacturer, for compensation in procuring certain dealer contracts in the assigned territory, and upon contracts concluded by the manufacturer itself, in breach of the distributor's monopoly. Judgment below was for Bohannan, and Ken-Rad appeals on the ground of error in the denial of its motion for directed verdict and requested instructions on the question of damages.

On May 4, 1931, Ken-Rad sent Bohannan a one-year distributor's franchise in duplicate, both copies of which the latter signed and returned. In June of that year, Ken-Rad's representative delivered to Bohannan a second one-year franchise, differing in some respects from the first, which was also signed, and then delivered

to the representative. On the ground that Ken-Rad never executed the first franchise or returned an executed copy thereof to Bohannan, and on the ground that there is no evidence that the second franchise was ever delivered to its home office, or to any officer having authority to execute the agreement, Ken-Rad contends that there is no writing binding the parties as to the matters. in controversy. It is clear, however, that both litigants operated under the terms of the franchise, that Ken-Rad's representatives understood that. it controlled relations with Bohannan, and that the Ken-Rad letter of October 23, 1931, canceling the contract, was "within the understanding of the contract with us," and so recognized the existence of the written agreement. We consider the issues here to be governed, therefore, by the written instrument executed in June, 1931, if otherwise it is valid and enforceable.

The instrument recites a purpose to define the relations of the manufacturer and distributor in the marketing of Ken-Rad radio tubes, to describe definite territory within which the distributor is to sell, and to provide terms that shall enter into all sales by the manufacturer to the distributor; the manufacturer, however, reserving the right to change the territory upon notice. The manufacturer agrees to sell, and the distributor agrees to buy, at list prices, to be established from time to time by the manufacturer, less a discount of 50–10–10 per cent., with the right reserved to the manufacturer to change the discounts when competitive market conditions warrant. In the event of reduction in prices, the manufacturer agrees to protect the distributor to the extent of tubes on hand or in transit, and for this purpose the distributor agrees to furnish a complete monthly inventory, and is likewise authorized to protect its dealers on price reductions. There follows a recital of the manufacturer's merchandising plan, with which we shall deal separately. Additional provisions reserve the right to the manufacturer to allot tubes to its distributors proportionately, and specify that acknowledged orders are not to constitute contracts to sell until apparatus or tubes are appropriated thereto. The distributor agrees to sell no tubes outside of his territory, and the manufacturer to refer to the distributor all inquiries and orders originating therein. The distributor is obligated to maintain a stock sufficient to promptly supply his territory, and to report his sales monthly on forms to be furnished by the manufacturer.. The distributor is also required to maintain an adequate testing department for servicing tubes. The agreement may be canceled at any time by either party upon 30 days' notice; the cancellation to terminate as of its effective date all orders not shipped, and to impose no liability on either party with respect thereto.

Paragraph 7 of the agreement details the manufacturer's merchandising plan, and recites that in order to assist the distributor the manufacturer has acquired from the Acremeter Company an exclusive right to distribute its tube-testing device, and copyrighted sales promotion plan; that the manufacturer, in co-operation with the distributor, contemplates placing acremeters and merchandising plan with desirable dealers on a basis that would require each dealer to agree to purchase $5,000 worth of tubes from the distributor at the rate of not less than $300 during each 90-day period, in consideration of which, upon the dealer's taking and paying for the required amount of tubes, the acremeter and plan would become his property. The dealer is to make a deposit of $200 with the manufacturer to guarantee the purchase agreement; the deposit to be refunded upon performance, and, in order to assure proper performance and operation of the plan, the distributor agrees to establish and maintain a tube department, with a competent manager and assistants, to install the acremeters and to thoroughly instruct the dealers in their use. Then follows this language: "As compensation therefor, the manufacturer will pay the distributor a commission of $25.00 on each acremeter so placed in his territory. And inasmuch as the return of said $200.00 deposit, and the passing of title to said instrument to the dealer is predicated upon the latter purchasing a total of $5000.00 worth of tubes, the distributor agrees to furnish the manufacturer on forms supplied for the purpose * * * an accurate record of the dealer's purchases on such tubes during the previous month."

Operating under the contract, Bohannan proceeded to stock Ken-Rad radio tubes and to solicit dealer contracts. Upon orders being sent to the manufacturer, the distributor was billed at factory list price, less discount of 50, 10, and 10 per cent. The distributor in turn billed the dealers at list price, less 40 and 10 per cent. The difference between the factory discount to the distributor and the distributor's dis-

count to the dealer was 25 per cent. of list price. While the distributor contract was in force, Bohannan secured seven dealers in his territory, each of whom signed a contract with the manufacturer, on forms provided by it, for the purchase of $5,000 worth of tubes, and for the installation of acremeters: the seven contracts being approved and accepted by the manufacturer. During this period the manufacturer concluded two additional dealer contracts in the distributor's territory with the Rudolph Wurlitzer Company; one for the latter's store at Columbus, Ohio, and the other for its store at Springfield, Ohio, Wurlitzer agreeing to purchase for each store $5,000 worth of tubes, and accepting for each an acremeter. The contracts with the Wurlitzer Company were in all respects identical with the dealer contracts procured by the distributor, except as to discount rates, which were higher. The distributor from time to time furnished tubes to its seven dealers, but no tubes were supplied by it on the Wurlitzer contracts. Bohannan claimed to be entitled to commission on the Wurlitzer agreements, and while the manufacturer conceded that some commission should be paid, it insisted in view of the greater discounts that it was to be at the rate of 5 per cent. on tubes sold, instead of 25 per cent. on total commitment. It must be noted here that the dealer contracts (including Wurlitzer) covered a period of years beyond the termination of the distributor's one-year franchise. On October 23, 1931, the manufacturer canceled the Bohannan contract as of November 22, 1931.

The theory upon which suit was brought was that the distributor was the manufacturer's agent; that the difference between the discounts allowed to it by Ken-Rad and the discounts it granted to dealers was its agent's commission, and notwithstanding the fact that but a limited number of tubes had been sold to dealers, and none at all on the Wurlitzer contracts, the distributor was entitled to 25 per cent. commission upon the total commitments of the dealers, including Wurlitzer, in their contracts with Ken-Rad; its claim being for 25 per cent. of $45,000, less the gross profit earned on tubes actually supplied to dealers prior to cancellation. This claim is asserted notwithstanding the fact that the manufacturer had the right under the contract without qualification to cancel the distributor agreement, that the dealer contracts extended beyond the expiration date of the distributor agreement, and that on the business done prior to cancellation the distributor had made no profit, but had sustained a loss. Overruling motions for directed verdict, and requests for an instruction that damages had not been proved, the court permitted the controversy to go to the jury upon the plaintiff's theory, and a verdict for $7,925 followed. It is open to fair inference that the verdict was arrived at by allowing plaintiff's claim for commissions in full, less his gross profit on goods sold, and less a counterclaim of $750 for radio tubes purchased from the defendant and unpaid for at the time of suit.

■ The validity of the contract is challenged on the ground that it lacks definiteness and mutuality. We do not so regard it. While price is not fixed, it is capable of definite ascertainment by reference to the manufacturer's list prices, even though the latter reserved the right from time to time to change price and rate of discount. While no quantity is specified in the agreement, that too was determinable. The contract required the distributor to maintain an adequate supply of tubes to meet the needs of dealers. The dealer contracts involved definite commitments to be supplied by the distributor. In Mills-Morris Co. v. Champion Spark Plug Co., 7 F.(2d) 38, the first circumstance alone was regarded by this court as sustaining a sufficiently definite obligation on the part of the seller to supply the purchaser, and as was said in Moon Motor Car Co. of New York v. Moon Motor Car Co., Inc., 29 F.(2d) 3, 4 (C.C.A.2), "There is no objection to a promise that it is indefinite so long as the parties can tell when it has been performed, and it is enough if, when the time arrives, there shall be in existence some standard by which that can be tested." The cases supporting this doctrine are there sufficiently cited.

■ Upon the question of damages, however, the defendant is on firmer ground, and this involves the construction of the contract, as to whether it is one of agency or one of sale. Except in one limited aspect, to be presently considered, we think it clear that the agreement was a sales agreement. The distributor was to buy, and the manufacturer was to sell. The terms of payment provided therein governed the distributor, and not his customers; the distributor might give dealers any terms it desired. Compensation of the distributor was measured in terms of dis-

count. Purchases and sales were clearly at its own risk, and with its own capital adventured. It is true that the dealer contracts were with the manufacturer, but they were for the benefit of the distributor, and obligated the dealer to buy from the distributor, so long as its contract should remain in force. The practical construction placed upon the agreement by the parties supports our view, for no claim for compensation was made by the distributor upon concluding any of the dealer contracts. It was content to make its profit on sales to dealers as and when made. In another aspect also is our conclusion supported. It would be an anomalous result, and one certainly not within the contemplation of the parties, to reward the distributor more generously upon a canceled contract than upon one fully performed, or to say that its profits (in the event there had been no cancellation) are to be greater upon expiration of its contract than upon a renewal thereof. We are not here dealing in this respect with a breached contract. The manufacturer had a right to cancel; one not limited, as in the Champion Spark Plug Co. Case, supra, by the existence of dissatisfaction, reasonable or unreasonable. Moreover, this right was mutual; the distributor having the privilege of exercising it equally with the manufacturer. Certainly it cannot be said that the parties contemplated a substantial premium to one of them to induce the cancellation of the contract.

 In one respect alone may the agreement be considered as one of agency, and that is in regard to the placing of acremeters with dealers, in pursuance of the recited merchandising plan. But if this arrangement is one of agency, it likewise controls the agent's commission. The distributor is to receive $25 for every acremeter "so placed." Since no acremeter may be placed without the dealer's commitment to purchase the required number of tubes, the commission clearly covers the placing of the acremeter with all things incident thereto. To that extent the distributor was an agent, and entitled to an agreed commission. Such further benefits as would come to it from the contracts made by the manufacturer with the dealers for its benefit must accrue, if at all, under the terms of the agreement, from its profits on the sale of radio tubes purchased by dealers. This in our view is the clear purport of the agreement in respect to the dealer contracts.

In concluding the Wurlitzer contracts, the manufacturer undoubtedly breached the distributor's agreement for exclusive territory. For this Bohannan has a right of action. But in order to recover damages it must show that it could have obtained the Wurlitzer business upon like terms. Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U.S. 200, 206, 207, 14 S.Ct. 523, 38 L.Ed. 411. This it has not done. But even so, it may recover only to the extent of sales actually made to Wurlitzer.

There was error in denying the motion for directed verdict, and in permitting recovery on the Wurlitzer agreements. Judgment reversed, and cause remanded for new trial.