# WALTER WOJTKOWSKI AND ANOTHER v. ALBERT H. PETERSON AND ANOTHER.[1]

April 20, 1951.

No. 35,377.

[1]Reported in 47 N. W. (2d) 455.

64

 

*J. Arthur Bensen* and *Theodore F. Neils,* for appellants.
*Harry E. Burns,* for respondents.

KNUTSON, JUSTICE.

Plaintiffs are husband and wife, as are the defendants. Defendants are engaged in farming in Benton county, this state. During the summer of 1947, they decided to go into the feed and mill business in addition to their farming operations, and with that purpose in mind purchased an acre of land at Morrill, in Morrison county, about two miles from the place where they lived. They then proceeded to build a feed mill. Before there were any negotiations with plaintiffs, they had the basement dug, forms in for pouring concrete, and the main part of the building begun.

Prior to 1948 plaintiffs resided in St. Louis. Neither of them had any experience in the feed and mill business, nor were they experienced in farming. Prior to her marriage to Albert H. Peterson, defendant Dorothy Peterson had been married to a doctor in St. Louis, where she then resided. While living there she became acquainted with plaintiffs. After Mrs. Peterson married her present husband and came to Benton county, she and Mrs. Wojtkowski kept in touch with each other by correspondence. In writing to Mrs. Wojtkowski in November 1947, Mrs. Peterson mentioned the fact that they were building a mill and inquired whether plaintiffs would be interested in going into business with them. Plaintiffs were interested. They came to the Peterson home on December 5 and remained there until December 8, 1947, and during that time they inspected the buildings and proposed location of the mill and dis-

cussed the matter for several days with the Petersons, after which an oral agreement of some sort was made, under the terms of which the parties were to engage in the business together.

The main dispute in the case comes about by virtue of a conflict in the testimony of the parties as to what the agreement was. Both parties agree that each couple was to invest $6,000 and receive a half interest in the business. Plaintiffs claim that they were to become partners at once and that there was no definite time fixed at which they were to invest their $6,000. Defendants claim that the Wojtkowskis were to receive an interest in the business after they had invested the sum of $6,000. As has been stated, Mr. Wojtkowski had no experience or knowledge of the feed business or farming. He was an electrician and sort of a "jack of all trades." He was to apply for an electrician's license, and the understanding was that eventually the partnership would engage in an electrical business in addition to the feed and mill business, Wojtkowski to handle the electrical work and the electrical business and the Petersons to handle the feed and mill business.

On February 24, 1948, plaintiffs moved their family to the home of defendants. In the meantime, plaintiffs had made certain payments, which, together with the amount they paid on arrival, amounted to $2,800. Both families had small children. The work of the enterprise was arranged so that both men worked in the mill and Mrs. Peterson also worked there in the daytime as a bookkeeper and in waiting on the trade. Mrs. Wojtkowski stayed at home during the daytime and took care of the children. They all lived in the same house and ate at the same table. The Petersons paid for the groceries and other household expenses. The mill was sufficiently completed so that it opened for business on March 15, 1948. The two men and Mrs. Peterson worked at the mill waiting on trade. They kept the mill open most evenings, and on such occasions Mr. and Mrs. Peterson would work one evening and Mr. and Mrs. Wojtkowski another, the couple who did not work staying at

home and taking care of the children. Mrs. Wojtkowski was never at the mill during the daytime.

Money that came in from the operation of the business was either deposited in the First State Bank of Gilman or used to pay expenses in cash. An account was opened in that bank, and checks were printed in the name of Morrill Feed and Supply Company. Both the defendants and Mr. Wojtkowski had authority to draw checks on the account.

Plaintiffs did not furnish any more money after they arrived in Minnesota, although defendants asked them frequently to do so, both before and after their arrival. On January 16, 1948, prior to the arrival of plaintiffs, defendants wrote them a letter which reads as follows:

"Foley, Minn.
Jan. 16, 1948

"Dear Walter & Jessie

"Well how is things coming for you folks. We are ready to start here now. The grinder is installed. The engine is in. The mixer is in. The company that we received the grinder from is holding the pulleys & V belts until we pay for all. Now I would like to know if you will have any more money within a week or 10 days for sure if not let me know by return mail. Because I will have to sell the 80 acres so we can get going. The big money is to be made from now on until late spring. We just have to get going.

"I just hate to sell the 80 acres. I have to take a big loss on it. It fits in so well with the rest of the farm. We get quite an income from it too.

"Dorthy would have written but she has been busy with income tax, the house work & kids.

"Well hope this finds you all well & getting some place.

"Your patners
"Pete & Dot.

"P.S. Business looks good. Many are begging us to get started. Two week ago a guy came over with his feed to get ground. then had to go some place else."

On February 19, 1948, plaintiffs wrote defendants a letter enclosing a check for $500 and stating: "We are waiting for the rest. We should have it tomorrow & when we do we will be on our way & we will bring the money with us." They actually brought an additional $500 with them.

Defendants had invested substantial sums in completing the building and equipping it for operation. The exact amount which they invested is immaterial.

Mr. Wojtkowski applied for an electrician's license but was unable to procure it, probably because of his lack of required residence in the state. The feed mill apparently was unable to support both families. On July 1, 1948, plaintiffs left the Peterson residence and moved into a house of their own. The reason for their removal does not appear from the record. Apparently there was no ill feeling between the families at that time, since defendants gave plaintiffs some furniture with which to equip their new home. They had some furniture of their own which they had brought with them from St. Louis. Thereafter plaintiffs did no more work around the mill, but, instead, Mr. Wojtkowski started an egg route of his own. Peterson testified that Wojtkowski "told me just before he left our house that he could not get his money and he could not go through with the deal and he would have to go out on his own and make a living, so he started an egg route. He was in the navy and, of course, he had his twenty dollars a month coming there, but he had to be in sort of a little business in order to collect it." Wojtkowski then asked Peterson for a return of the money he had invested. Peterson gave him $50 and told him that he could not return the balance at that time, but that he would return it when he could.

This action was commenced to recover the funds invested by plaintiffs on the theory that defendants had committed a fraud, it being the contention of plaintiffs that defendants had represented to them that they would be partners in the enterprise; that defendants had no intention of giving them an interest in the business at the time the agreement was made; and that upon discovering that

they had no interest in the business plaintiffs chose to rescind the transaction and to sue for a return of that with which they had parted. The case was submitted to a jury, and plaintiffs recovered a verdict. From an order denying an alternative motion for judgment notwithstanding the verdict or a new trial, this appeal is taken.

■ Defendants' brief contains three assignments of error, all relating to the admission or rejection of offered evidence, none of which would justify a reversal. The motion for judgment notwithstanding the verdict or a new trial does assign as grounds therefor the insufficiency of the evidence to sustain a finding of fraud. On appeal, the insufficiency of the evidence is not assigned as error. The general rule is that an assignment of error on a motion for a new trial is waived if it is not renewed on appeal, unless it goes to the jurisdiction over the subject matter in litigation. Martinson v. State Bank, 137 Minn. 476, 163 N. W. 503; Winans v. Northern States Power Co. 158 Minn. 62, 196 N. W. 811; Peterson v. Pete-Erickson Co. 186 Minn. 583, 244 N. W. 68.

■ Both parties have argued in their briefs the question of the sufficiency of the evidence to establish fraud; and, inasmuch as this question is decisive not only of this appeal but of the case on its merits, we have concluded to consider the case on its merits even though the assignments of error are inadequate. This we may do in our discretion. Clavin v. Semple, 90 Minn. 491, 97 N. W. 1117; McCuskey v. Kuhlmann, 147 Minn. 460, 179 N. W. 1000; Eaton v. Eaton, 161 Minn. 293, 201 N. W. 289; Taney v. Hodson, 170 Minn. 230, 212 N. W. 196; Finley v. Erickson, 122 Minn. 235, 142 N. W. 198. By voluntarily arguing the matter, plaintiffs may also be held to have waived the inadequacy of the assignments of error. Marcum v. Clover Leaf Creamery Co. 225 Minn. 139, 30 N. W. (2d) 24.

■ The law respecting the establishment of fraud is well settled in this state. The rules are well stated and numerous authorities collected in Maguire v. Maguire, 171 Minn. 492, 496, 214 N. W. 666, 668, 215 N. W. 522, where we said:

"The gist of the fraud is not the failure to perform the promise but the fraudulent intent of the promisor, at the time of making the promise, not to faithfully perform the promise and to deceive the promisee by the false promise. By keeping this in mind we easily come to a logical conclusion. The misrepresentation of his then existing intent to perform must be shown. A subsequent intention to break a promise does not constitute fraud. There is slight authority holding that the fraud is established by showing nonperformance. C. T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. 39; Carr v. Craig, 138 Iowa, 526, 116 N. W. 721. We are of the opinion that the prevailing rule is that failure to fulfil the promise alone will not authorize the conclusion of fraud. A broken promise does not prove fraud. It must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made."

Fraud cannot be predicated on a mere promise or intention to perform, unless it is affirmatively made to appear that at the time it was made there was no intention to perform. Bernstein v. Levitz, 218 Minn. 576, 16 N. W. (2d) 744; Cannon Falls Holding Co. v. Peterson, 184 Minn. 294, 238 N. W. 487. Plaintiffs do not question these rules of law, but contend that the evidence in this case affirmatively shows an intention not to perform at the time the agreement was made. It is the contention of plaintiffs that the conduct of defendants, as shown by the evidence, manifests an intent on their part not to make plaintiffs a partner, which intent was present at the time the agreement was made. Plaintiffs rely for the main part on the testimony of Mrs. Wojtkowski and such exhibits as there are. Mr. Wojtkowski, who was undoubtedly more familiar with the operation of the business concerning which Mrs. Wojtkowski testified, was not even called as a witness. Mrs. Wojtkowski was never present in the mill during the daytime when the Petersons were there, and what information she had she gathered largely from what her husband told her. She testified that neither she nor her husband had access to the books and that they were not informed

as to where the money was going, and she assigns that as the reason for refusing to put in the balance of the $6,000 which they had agreed to invest. She testified that there was no checking account and that her husband had no access to such account if there was one, but when confronted with a number of checks drawn by her husband on the company account she was forced to admit that there was such an account and that her husband had drawn checks on it. She testified that there were no books of account available to them. Mrs. Peterson testified that there was a book showing all financial transactions of the enterprise available at all times to Mr. Wojtkowski and that she had discussed it with him on many occasions. Mrs. Wojtkowski was in no position to deny this, nor was her husband ever called as a witness.

Not only does the evidence fail to show an intent on the part of defendants not to perform, but it seems to us that it affirmatively appears that a partnership of some sort was actually formed. It may not have turned out as profitably as the parties had anticipated, but that is no evidence of fraud. The testimony of Mrs. Wojtkowski pertaining to the operation of the business is based so largely on what her husband told her, and it is apparent from her testimony relating to the checks that he did not tell her everything, that it seems to us that this alone is insufficient to establish any fraud. That the parties established a company account in the name of the partnership and that Mr. and Mrs. Peterson and Mr. Wojtkowski all had authority to draw checks on it cannot well be denied. It is evident that when Mr. Wojtkowski failed to furnish the balance of the money the Petersons then refused to complete the deal by transferring a share of the property to the partnership, but that is as much a failure of performance on the part of one of the parties as on the part of the other. It furnishes no proof of an intention on the part of defendants not to perform at the time the agreement was made. As a matter of fact, defendants were willing to complete the deal even at the time of trial if plaintiffs would put in the balance of their money. We fail to see that plaintiffs have shown

an intention not to perform at the time the agreement was made; consequently defendants were entitled to a directed verdict and are now entitled to judgment notwithstanding the verdict.

Reversed with instructions to enter judgment for defendants.

[1]Reported in 47 N. W. (2d) 459.