GENERAL CORPORATION, Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

Civ. No. 2713.

United States District Court
D. Minnesota,
Third Division.

May 27, 1960.

C. Paul Smith, St. Paul, Minn., Harry H. Peterson and Eugene A. Rerat, Minneapolis, Minn., for plaintiff.

Cant, Taylor, Haverstock, Beardsley & Gray, by Franklin Gray, Minneapolis, Minn., and Daniel Boone, Detroit, Mich., for defendant.

DEVITT, District Judge.

Defendant moves for judgment notwithstanding the verdict or for a new trial following a $100,000 jury verdict in this action for deceit. The plaintiff Minnesota corporation is a former wholesale distributor for the Delco Appliance Division of the defendant. The plaintiff's complaint alleged that the defendant fraudulently represented it would not market its Delco heating products directly to retailers in the plaintiff's franchise area, and that the plaintiff's business was wrongfully destroyed when the defendant cancelled the wholesale agreement between them and changed to a direct retailing basis.[1] The defendant denied these allegations.

Here is a brief summary of the evidence presented.

Verne Nelson, president of plaintiff, had worked for the Delco Appliance Division of General Motors in various positions prior to 1939, at which time he and another employee formed a partnership to act as the wholesale distributor of Delco heating products in the Minnesota area. The partnership later became the plaintiff corporation which continued business through 1949, selling principally Delco home-heating products.

During these years, there were apparently five franchise agreements between the parties which operated consecutively over the period. The first bore the date June 1, 1939; the second, January 2, 1942; the third, December 31, 1946; the fourth, December 3, 1947. The facts surrounding the execution of the fifth agreement are in marked dispute.

Verne Nelson testified that he signed the fifth contract on February 10, 1949 in Rochester, New York, after Mr. Andrew Freimann, Delco's general sales manager, had assured Nelson that the defendant "would never go on a direct basis" in the plaintiff's franchise area. As in the previous agreements, this contract had a clause stating that there were no other agreements between the parties and also a provision that the agreement could be cancelled upon ninety days' notice by the defendant and upon thirty days' notice by the plaintiff.

Mr. Freimann denied that any such discussion or promises took place on Nelson's February 10th visit to Rochester, and claimed, as did Delco sales representative Goddard, that the contract was signed by Nelson in Minneapolis on May 19, 1949. The defendant attempted to disprove plaintiff's story and support its own by the testimony of a printer who concluded from his records that the fifth contract form was not in existence until April of 1949.

The plaintiff's evidence tending to show that the defendant had no intention of keeping its alleged oral promises was that prior to February, 1949 and throughout 1949, the defendant was cancelling many wholesale distributorships. The defendant sought to show that although a policy of converting to direct retail distribution did come into existence, it was not conceived until August, 1949, as evidenced by written executive committee reports.

Mr. Nelson further testified that in December, 1949, Mr. Goddard attempted to trick him into signing a retail dealer's agreement by representing that it was the same old wholesale arrangement. Goddard's version of this event was that he made a full disclosure and explanation of the new contracts, but that Nelson rejected the idea of converting to a retail dealership. Shortly after this, the defendant cancelled plaintiff's wholesale contract and began selling directly to retailers in the plaintiff's former territory.

Plaintiff's proof of damages was based primarily on the testimony of Verne Nelson and Russell Nelson, a C.P.A., who opined that the good will of General Corporation in December, 1949 was worth $450,000 and $400,000 respectively, and that after the cancellation it was

[1.] The original complaint also included a claim under the Sherman Anti-Trust Act, but this was barred by the Minnesota statute of limitations. General Corp. v. General Motors Corp., D.C.Minn.1956, 140 F.Supp. 219.

worth nothing. The defendant's expert testified that the plaintiff's good will was of no value either before or after the cancellation.

Defendant's motion for judgment n. o. v. is based on four grounds. That the statute of frauds bars the action. That the plaintiff had no right to rely on any oral promises. That there was no showing of "out of pocket" damages. That the evidence was insufficient to show an intent not to perform the alleged promises.

Before considering these individually, however, it should be observed that since the fraud law of New York and Minnesota are apparently very similar on the points here considered, the parties have made no issue of the conflicts of law problems and have been mutually content to cite cases primarily from Minnesota.

### The Statute of Frauds

■ The defendant recognizes that both Minnesota and New York follow the rule that promises made without an intent to perform can constitute the basis of an action in deceit. Olson v. Smith, 1912, 116 Minn. 430, 134 N.W. 117; Deyo v. Hudson, 1919, 225 N.Y. 602, 122 N.E. 635; see Annotation, Promises and Statements as to Future Events as Fraud, 1927, 51 A.L.R. 46, 63. The defendant contends, however, that an action in deceit is nevertheless barred when based on promises which would be unenforceable as an oral contract under the statute of frauds.

In New York the case of Channel Master Corporation v. Aluminum Ltd. Sales, Inc., 1958, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 has decided this issue against the defendant. On the other hand, we are unable to find a Minnesota case which considers the problem. The Minnesota statute provides:

"No action shall be maintained * * * upon any agreement, [unless in writing] * * * that by its terms is not to be performed within one year from the making

thereof." 30 M.S.A. § 513.01 (1947).

■ Mr. Nelson testified that Mr. Freimann said "that they would never go on any other than a wholesale basis in our area, which as far as we were concerned would be indefinitely, provided we did our part of the job right." Assuming this can constitute an agreement which by its terms is not to be performed in one year, compare, Metropolitan Trust Co. v. Topeka Water Co., C.C.D.Kan. 1904, 132 F. 702 with, Warner v. Texas & Pac. Ry., 1890, 164 U.S. 418, 17 S.Ct. 147, 41 L.Ed. 495, it is my view that the Minnesota statute of frauds does not bar this action in deceit.

Recognition that fraudulent promises can constitute a tort does not of itself determine that the statute of frauds is inapplicable. Instead, the authorities are in conflict. See Comment Note, 104 A.L.R. 1420 (1936). One view taken is that the statute of frauds addresses itself to the enforceability of oral contracts and does not affect the validity of actions based on fraud. Schleifer v. Worcester North Sav. Inst., 1940, 306 Mass. 226, 27 N.E.2d 992; Burgdorfer v. Thielemann, 1936, 153 Or. 354, 55 P.2d 1122, 104 A.L.R. 1407; see Restatement, Torts § 530(b) (1938); Keeton, Fraud, Statements of Intention, 15 Tex.L.Rev. 185 at 200 (1937). Another position reasons that if an action in fraud were allowed to be brought on promises which are unenforceable as contracts, the legislative policy of the statute would be defeated. Cohen v. Pullman Co., 5 Cir., 1957, 243 F.2d 725; Canell v. Arcola Housing Corp., Fla.1953, 65 So.2d 849.

The most practical approach appears to me to be one touched upon by the Utah Court in Papanikolas v. Sampson, 1929, 73 Utah 404, 274 P. 856, that if the damages sought are primarily tort damages, the statute should not affect the action, but if the damages sought are substantially the same as contract damages, the action is really one to enforce an oral contract and should be barred. So whereas in Papanikolas the verdict was directed for the defendant because,

among other things, the damages being sought were the difference between market value of land and its oral sale price, here the gravamen of the complaint is the wrongful destruction and appropriation of the plaintiff's business, and presuming the plaintiff is capable of showing tort damages, he should not be barred by the statute of frauds.

To say this is the best result is one thing. To say it is, or will be, the law of Minnesota is another. I think some indication that the Minnesota Supreme Court would reach the same solution can be found in its application of the "out of pocket" rule as the measure of damages in fraud as opposed to the "benefit of the bargain" rule. Tysk v. Griggs, 1958, 253 Minn. 86, 91 N.W.2d 127, 134; Annotation, 1940, 124 A.L.R. 37, 52–53.

The "out of pocket" rule is more logically consistent with tort theory of recovery by compensating the plaintiff for what he has lost, while the "loss of bargain" rule coincides with contract theory by giving the plaintiff the benefit of what he was promised. Prosser, Torts 568–69 (2d ed. 1955). The application of the "loss of bargain" rule as the measure of recovery for fraudulent oral promises might well justify the criticism that the contract is being enforced in derogation of the legislative policy underlying the statute of frauds. On the other hand, if the "out of pocket" rule is the measure of recovery, as it is in Minnesota, it seems to me to be less of an objection to say that the purpose of the statute is being defeated since the recovery is theoretically and practically different from that obtained by enforcement of the contract. Although I can find no such established correlation between the measure of damages and the applicability of the statute of frauds, it is significant to me that New York, which is also among the minority jurisdictions espousing the "out of pocket" rule, Reno v. Bull, 1919, 226 N.Y. 546, 124 N.E. 144, adopts the view that the statute of frauds does not bar an action based upon fraudulent promises. Channel Master Corporation v. Aluminium Ltd. Sales, Inc., 1958, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833; also, compare, Burgdorfer v. Theilemann, 1936, 153 Or. 354, 55 P.2d 1122 and Whitcomb v. Moody, Tex.Civ.App.1932, 49 S.W.2d 513, with respective state law cited in Annotation, 1940, 124 A.L.R. 37 at pages 63, 65.

I conclude that the Minnesota statute of frauds does not bar this action. See, Schenley Distillers Corp. v. Renken, D.C.E.D.S.C.1940, 34 F.Supp. 678; Erskine v. Chevrolet Motor Co., 1923, 185 N.C. 479, 117 S.E. 706, 32 A.L.R. 196; but see, Cassidy v. Kraft-Phenix Cheese Corp., 1938, 285 Mich. 426, 280 N.W. 814.

### Reliance on Oral Promises

The defendant's second contention is that the merger clause [2] and cancellation provisions [3] of the subsequent written contract foreclose the plaintiff's right to rely on any prior oral promises that the defendant would not change to direct retail distribution. The case of Ganley Bros., Inc. v. Butler Bros. Bldg. Co., 1927, 170 Minn. 373, 212 N.W. 602, 56 A.L.R. 1 disposes of the argument that the merger clause bars the action. There, fraud in the inducement was permitted to be shown even though the plaintiff knowingly signed a contract reciting that no statements made by the

---

2. "Sole Agreement of Parties. No change in, addition to, or erasure of, any printed portion of this Agreement (except the filling in of blank lines) shall be valid or binding unless approved in writing by the General Manager and the General Sales Manager of Seller.

"There are no other agreements or understandings either oral or in writing between the parties affecting this Agreement or relating to the sale or servicing of Delco Appliance Products, parts or accessories. This Agreement cancels and supersedes all previous agreements between the parties hereto."

3. "Termination by Seller on Three Months' Notice. Seller, at its will and option may terminate this Agreement at any time by giving to Distributor written notice of such termination three (3) months in advance of such termination."

defendant were being relied upon. See also, General Electric Co. v. O'Connell, 1912, 118 Minn. 53, 136 N.W. 404.

The inconsistency between the alleged promises and the cancellation provision, however, presents a harder question. As to the circumstances surrounding the February 10th meeting, Nelson testified that he was apprehensive because he had heard rumors that Delco was cancelling its wholesale distributorships on the east coast, and that he intended to terminate his relationship with Delco because of its slowness in bringing out a line of gas heating equipment and because he had been offered a wholesale distributorship with Norge, a competitor of Delco. After relating these matters to Mr. Freimann, Nelson testified he relied on Freimann's promises that Delco would never go on a direct selling basis in his territory and that the gas equipment would soon be out, signed a franchise contract in blank without reading it, returned to Minneapolis and rejected the Norge offer.[4]

■ Although Minnesota law recognizes that a promise made without intention of performance is an actionable tort,

when the promise is in plain contradiction of the written terms of a valid contract, before the plaintiff will be allowed recovery he must show either deceit as to the contents of the document or misrepresentation of facts independent from the promisee's contradictory intent. Henvit v. Keller, 1944, 218 Minn. 299, 15 N.W.2d 780; McCreight v. Davey Tree Expert Co., 1934, 191 Minn. 489, 254 N.W. 623; Nelson v. Berkner, 1918, 139 Minn. 301, 166 N.W. 347.

It is doubtful whether the plaintiff has shown sufficient evidence of fraud in the execution of the 1949 franchise contract. Nelson testified that he never read any of his franchise contracts until the suit was begun, that there were long lapses of time between his signing of the tip-in sheets and his receipt of the fully completed contracts, that he relied on his long experience and knowledge of the defendant's policies and the oral representations of the defendant's agents, and that he signed the 1949 contract in blank relying on the promises of Mr. Freimann. Despite the statement in the plaintiff's brief that Nelson understood the written contract to contain the

---

4. Mr. Nelson testified:

"A. I explained to Mr. Freimann that we had an opportunity of taking on another nationally known line of heating equipment * * * and that because we were not getting gas equipment it was very important that we make some move in that direction because we were losing out too much. Mr. Freimann assured me that the gas equipment would be out, possibly the first part of May or June 1 at the latest; that we would then be getting gas conversion burners and some of the gas design jobs.

"Q. And what did he say about you taking on this Norge line, if anything? A. Well, he told me that they didn't want to lose the experience of our organization because we had been with the Delco setup from its inception in 1933, and that I could set my mind at rest as far as getting the Delco-built gas equipment * * * I also brought up the fact that they had been making several changes in the East and we felt that they no doubt would be doing the same in our territory. He gave me his assurance that such a change— * * * He stated

that we were on the off-beaten path in the Twin City area and the Delco appliance would never go on a direct basis in our area, and I would have no cause for alarm. Those were the two principal things I was interested in; first, were we going to get gas equipment; secondly, were they going to be retailed in our territory.

"Q. Now, was there anything said about the franchise, written franchise? A. Well, I signed my franchise at the time I was down there and left it with him.

*     *     *     *     *

"Q. Well, then did you rely on these promises that he made to you? A. I did, because I had known Mr. Freimann during the days that he worked for Frigidaire.

"Q. Now, when you got back to Minneapolis, what did you do about this Norge line that you had the opportunity of getting at that time? A. I told the representative that we were not interested because my doubt and fears had been taken care of by my trip to the factory."

promises made by Freimann, it is doubtful if the evidence will support this conclusion. At no time did Mr. Nelson testify that he was unaware of the cancellation provisions in the contract, or that Mr. Freimann made representations one way or another that the written terms of the contract provided for a franchise of indefinite duration or that it provided that Delco would never go on a direct selling basis.

Assuming the absence of fraud in the execution, it becomes necessary to decide whether there was such plain contradiction between the alleged promise not to go on a direct selling basis in the plaintiff's territory and the written cancellation provisions as to require a verdict for the defendant. The appropriate guiding principles for the solution of this question are the subject of a diversity of opinion in other jurisdictions, see Annotation, Parol-Evidence Rule, Right to Show Fraud in Inducement or Execution of Written Contract, 1928, 56 A.L.R. 13, and the relevant Minnesota cases are, in my view, not entirely reconcilable.

In Nelson v. Berkner, 1918, 139 Minn. 301, 166 N.W. 347, the plaintiff sued in rescission for return of a payment made toward the purchase of a farm, on the basis that the defendant had misrepresented its productiveness and had made oral promises to return the money if the plaintiff could not make a success of the farm. Speaking for the Court, Justice Holt states:

"[H]ere it is claimed that the promise to pay back the $3,000 with interest, is inconsistent with the written stipulation that any payments made should be retained by defendant in case plaintiff defaulted. But the rule of evidence that parol testimony may not be received to contradict a written agreement, or to add to or modify its terms, is subject to the exception that, where fraudulent or false representation of the one party procured the other party's signature, the representation may be proven for the purpose of annulling or rescinding the contract, no matter how variant with its terms. * * *

* * * * * *

"* * * Our conclusion is that the rule excluding proof of oral representations or statements to vary or contradict a written agreement is not applicable to fraudulent oral representations whereby the one party induced the other to enter the contract, provided these are such that the other party might rely thereon.

"But it does not follow that every fraudulent promissory representation will serve as basis for rescission of a contract induced thereby, any more than that every misrepresentation of existing condition does. It is always a necessary element in the rescission of a contract for fraud that the one claiming the right to rescind relied upon the truth of the representation, having no knowledge of their falsity or fraudulent character * * * So with a fraudulent promissory representation which is plainly contradicted by the undertaking or the stipulations in the written agreement. The promisee would then know that the promise was false, or could not be kept, if what was written was to have any effect, and consequently could not rely thereon. Therefore it is not often that a fraudulent promissory representation in respect to the subject matter or the terms of a written contract, standing alone, affords ground for rescission. In Banque Franco-Egyptienne v. Brown, (C.C.) 34 Fed. 162, Judge Wallace says:

"'Promissory statements may be made in terms which imply that a certain condition of things exist at the time and form the basis of the future state of things. When they are of this description, if they are intentionally false, they are fraudulent, and form the basis of a right of rescission.'" 166 N.W. 348–349.

Applying the above principles, the Court affirmed a verdict for the plaintiff by concluding that the jury could find reasonable reliance on the promises predicated upon misrepresentations concerning the productiveness and cultivated acreage of the farm.

Sixteen years later, with Justice Holt still sitting on the Court, McCreight v. Davey Tree Expert Co., 1934, 191 Minn. 489, 254 N.W. 623 was decided. An employee had made a written "full settlement" of his rights under a stock purchase plan by accepting eleven shares of stock in lieu of the return of his money. In an action in quasi-contract for money had and received, the complaint alleged misrepresentations of value and fraudulent promises by the employer that it would take back the eleven shares at a later date when cash would be more available. The Court reversed a jury verdict and granted the defendant a judgment notwithstanding the verdict. After stating the parol evidence rule, Justice Stone states:

"[W]e are already aligned with the view that 'a contractual promise made with the undisclosed intention of not performing it is fraud.' Restatement Contracts, § 473. That section is self-qualified thus: 'Though a promise that could in no event be binding, or a mere prediction, may involve the same representation of mental attitude as if the promise were made for sufficient consideration, the representation is not fraud unless there is implied * * * an assertion of other facts. One who is informed as to the law would not be deceived, and the consequences of ignorance of the law are here, as generally, not sufficient basis on which to found legal relief.' Id. Comment d.

"Apropos of that is this comment from Nelson v. Berkner, 139 Minn. 301, 307, 166 N.W. 347, 349: 'So with a fraudulent promissory representation which is plainly contradicted by the undertaking or the stipulations in the written agreement. The promisee would then know that the promise was false, or could not be kept, if what was written was to have any effect, and consequently could not rely' on the extraneous oral promise.

" * * * Were the law otherwise, there would be an absurd futility in written contracts which it is the purpose of the parol evidence rule to prevent." 254 N.W. 624–625.

The two judges dissenting were of the opinion that under the rule in Nelson v. Berkner, the question should properly have been left to the jury as a question of reasonable reliance because the promise was predicated upon the further misrepresentation that the defendant had no cash available when in fact it did.

The majority opinions in McCreight v. Davey Tree Expert Co. and Nelson v. Berkner seem to be in conflict. Compare majority and concurring opinions in Beers v. Atlas Assurance Co., 1934, 215 Wis. 165, 253 N.W. 584. Subsequent Minnesota cases do not shed much light on the proper reconciliation and favor the result reached in McCreight v. Davey Tree Expert Co. Henvit v. Keller, 1944, 218 Minn. 299, 15 N.W.2d 780; Northrop v. Piper, 1937, 199 Minn. 244, 271 N.W. 487; Greear v. Paust, 1934, 192 Minn. 287, 256 N.W. 190. Nevertheless, the basic rule in Nelson v. Berkner still remains since it is repeatedly cited with approval.

As I read this series of cases, the Minnesota rule is that in the case of fraudulent oral promises inducing a written contract, where no fraud in the execution is shown, but there is an inconsistency between the oral promise and the written terms of the contract, the issue is primarily one of determining whether there could be reasonable reliance on the promises. The parol evidence rule as an exclusionary rule of evidence to be applied by the judge to avoid altering or varying the written terms of a contract is not necessarily equivalent to the judge's obligation to direct a verdict for the defendant on the

basis that there could be no reasonable reliance as a matter of law.

■ When the statements imply only a contradictory state of mind such that they are essentially a promise that certain provisions of the contract will not be operative, both lack of reliance and the policy of the parol evidence rule can be said to require a verdict for the defendant. But when the promise is not in plain contradiction of the contract or, if contradictory, when accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question is for the jury as a matter of reasonable reliance.

Plain contradiction in a fraud action, therefore, should not be made coextensive with the parol evidence test of inconsistency, variation, or modification. Just as the misrepresentation of other facts may make an admittedly contradictory promise actionable, as Nelson v. Berkner points out, similarly it seems implied in the Minnesota cases that the circumstances which fall short of fraud in the execution for lack of deceit as to the contents of the document may still be considered as factors de-emphasizing inconsistency, increasing the probability of reasonable reliance, and tending to show that the oral statements, while admittedly inconsistent, were nevertheless not in plain contradiction of the integrated written contract. See Beers v. Atlas Assurance Co., 1934, 215 Wis. 165, 253 N.W. 584, concurring opinion of Fairchild, J. at pages 594–595.

Although rescission involves elimination of the contract and an action for damages involves affirmance of the contract, Beers v. Atlas Assurance Co., 1934, 215 Wis. 165, 253 N.W. 584, I do not perceive that Minnesota has drawn any distinction on this basis, nor that a stricter rule should be required in an action for damages than in an action for rescission, so long as relatively the same measure of recovery results under the "out of pocket" rule. See Prosser, Torts 569 (2d ed. 1955); Keeton, Fraud, Statements of Intention, 15 Tex.L.Rev. 185, 216–20 (1937).

■ Here, the promise was not that the defendant would not exercise the cancellation clause; it was instead a promise stating that the defendant would not go on a direct selling basis in the plaintiff's territory; a promise predicated on representations that conversions from wholesale to retail dealers on the east coast were not being carried out pursuant to a plan of total conversion; a promise made under circumstances in which no particular reference was being made to the written terms of a renewal contract; a promise founded in a context of a ten-year relationship. I conclude that the question of inconsistency between the oral promise and the written terms of the contract were properly left to the jury as a question of reasonable reliance, and agree substantially with the statements of Judge Donovan in his unreported memorandum opinion denying the defendant's motion for summary judgment.[5]

5. "If the plaintiff were merely claiming that there was an oral representation that there would be no right to terminate on three months' notice, there would be a contradiction between that representation and the written contract. However, the plaintiff claims that the defendant represented, inter alia, that it had no intention of changing to a retail system of distribution in this area and, hence, that this particular reason for exercising the right of termination on three months' notice contained in the wholesale distributorship contract would not arise in the foreseeable future, whereas at the time this representation was made the defendant had already decided to change to retail distribution in this area. This representation was not contradicted by anything in the written contract, and the plaintiff alleges that it was relying on it and the increased stability it gave the written contract at the time when it was decided to continue the business relationship with the defendant rather than pursue other opportunities. For this reason the case of Henvit v. Keller, 218 Minn. 299, 15 N.W.2d 780, and the related cases relied on by the defendant in this second argument are readily distinguishable from the instant case, and hence are not applicable."

Proof of "Out of Pocket" Damages

The third contention of the defendant is that there should be a directed verdict because the "out of pocket" measure of damages is applicable here and precludes recovery of prospective profits, which, on the record, constitute the plaintiff's sole proof of damages. The plaintiff, on the other hand, says that the "out of pocket" rule should be limited to fraud in the sale or exchange of property and in any event is not inconsistent with a recovery of good will based on prospective profits.

■■ It is clear that Minnesota generally follows the "out of pocket" rule, Lehman v. Hansord Pontiac, 1955, 246 Minn. 1, 74 N.W.2d 305, 311; 8 Dunnell Minn.Dig., Fraud § 3841 (1953); which is the minority view. Comment note, 124 A.L.R.1940, 37 at page 53. The basic premise of this rule, in opposition to that of the "loss of bargain" rule, is that the plaintiff can recover only what he has lost and not the benefit of what he was promised. Expected profits from the transaction cannot be recovered under the "out of pocket" rule. Sager v. Friedman, 1936, 270 N.Y. 472, 1 N.E.2d 971; Reno v. Bull, 1919, 226 N.Y. 546, 553, 124 N.E. 144.

The fact that the "out of pocket" rule is most often applied in situations involving fraud in the sale or exchange of property does not in my view determine that it is limited to such cases. The "loss of bargain" and "out of pocket" rules are merely two different interpretations of the damages resulting directly and proximately from the fraud. They are not two independent theories in opposition to that which is direct and proximate. 24 Am.Jur., Fraud & Deceit §§ 226–28 (1939). Thus in Lowrey v. Dingemann, 1957, 251 Minn. 124, 86 N.W.2d 499, where recovery was had for damage to the plaintiff's reputation and business good will and for loss of profits actually earned prior to discovery of the fraud, the Court makes it clear that such recovery was had within the "out of pocket" principles and not on any theory that on this occasion the direct and proximate results were damages based on the "loss of bargain" theory. So here, we must attempt to remain consistent with the basic principles of the "out of pocket" rule in determining the proper elements of damages under the circumstances of this case.

■ The defendant asserts that the plaintiff could have no good will as a matter of law because all rights in the trade name "Delco" were reserved to the defendant and the franchise was subject to cancellation upon ninety days' notice.[6] Several tax cases are cited in support of this proposition, among them, Noyes-Buick Co. v. Nichols, D.C.1926, 14 F.2d 548 and Newcomb, 1955, 23 T.C. 954, 962. The defendant further argues that if a jury is allowed to evaluate the good will on the basis of a franchise lasting for the indefinite future as represented by the promises, we would be directly contravening the "out of pocket" rule by awarding damages hypothecated on the proposition that the promises had been kept. But this is not to say that the plaintiff's organization could have no

---

6. In addition to the cancellation provisions, the contract also provided:
  "This Agreement constitutes a personal contract, having been entered into in reliance upon and recognition of Vernon E. Nelson * * * who actively and substantially participate(s) in the ownership and/or operation of the distributorship. Distributor shall not transfer nor assign this Agreement or any part thereof, nor make nor suffer to be made any substantial change in the ownership, financial interest or active management of the Distributor.
    " * * *

  "Seller is exclusively entitled to use the words 'Delco', 'Delco Appliance', or 'Delco-Heat', and the Delco Appliance trademark or trade-marks, including the distinctive outline or form thereof and of the good will attached thereto . . .
  "If the words 'Delco', 'Delco Appliance', or 'Delco-Heat' are used in any name sign or advertising used or displayed by the Distributor, Distributor will upon termination of this Agreement, or upon request of Seller, discontinue the use of the same."

good will independent of its Delco franchise. Nelson wished to terminate his relationship in February of 1949 and to continue with Norge. Whatever independent value its established relations with retail dealers had under these circumstances was destroyed by the inducement to stay with Delco and by the subsequent cancellation when it had no opportunity to remain in the wholesale business by taking on another major line. Certainly the plaintiff's business had *some* value which was lost as a result of the alleged deceit. I cannot conclude that there were no damages, as a matter of law.

### Intent to Perform the Promises

The fourth contention raised by the defendant in support of his motion for a directed verdict is that there was insufficient evidence for the jury to make the essential finding that there was no intent to perform the promises at the time they were allegedly made. The plaintiff's evidence of this intent consisted in the cumulative circumstances tending to show that as early as February, 1949, General Motors planned to switch to retail distribution once its gas burners were ready for distribution, and that it desired to retain the plaintiff's distribution organization until that could be accomplished.

The main piece of evidence on this issue was plaintiff's Exhibit 9, which was prepared by the defendant in response to the plaintiff's pre-trial interrogatory and reflects the initiation and termination dates of all Delco wholesale distributorships. Plaintiff's Exhibit 9 is summarized in Plaintiff's Exhibit 10.[7]

The defendant, through the testimony of its executives, attempted to explain the terminations prior to November 19, 1949 by reference to a dual system of distributorships under which all distributors had the same contract, but the so-called "A" distributors were primarily wholesalers, while "B" distributors were primarily retailers. The plaintiff's contract was an "A" distributorship. The lengthy examination of these witnesses is best summarized by Defendant's Exhibit T.[8]

---

7. Wholesale Distributors between 1946 and 1952 . . . . . . . . . . . . . 274

| | |
|---|---|
| Franchises terminated prior to January, 1949 | 38 |
| Franchises terminated during January, 1949 | 7 |
| Franchises terminated during February, 1949 | 1 |
| Franchises terminated during April, 1949 | 14 |
| Franchises terminated during May, 1949 | 33 |
| Franchises terminated during June, 1949 | 30 |
| Franchises terminated during July, 1949 | 10 |
| Franchises terminated during August, 1949 | 5 |
| Franchises terminated during September, 1949 | 3 |
| Franchises terminated during October, 1949 | 1 |
| Franchises terminated during November, 1949 | 2 |
| Franchises terminated during December, 1949 | 67 |
| Franchises terminated during January, 1950 | 22 |
| Franchises terminated during February, 1950 | 14 |
| Franchises terminated during March, 1950 | 11 |
| Franchises terminated during April, 1950 | 5 |
| Franchises terminated during May, 1950 | 4 |
| Franchises terminated during June, 1950 | 3 |
| Franchises terminated during July, 1950 | 4 |
| | 274 |

8. "A" Distributor is a distributor whose activities were primarily wholesale and secondarily retail. The "A" Distributor received the base price known as 'net distributor billing' (N.D.B.). A "B" Distributor is one whose activities were primarily retail and secondarily wholesale. The "B" Distributor's price schedule was ten percent above net distributor billing.

"The following are included in Exhibit 9:

| | |
|---|---|
| 106 | 'B' Distributors |
| 167 | 'A' Distributors |
| 1 | Retail Dealer included in error |
| 274 | Total Listing" |

The defendant's witnesses testified that Delco could not change its basic distribution policy without the approval of the Household Appliance Group, which was a management committee composed of top executives from General Motors and its various divisions. The testimony of the witnesses was that a decision to go on a direct retail basis did not come into being until August, 1949, when it was first raised in a committee meeting on August 10, and put into written recommendation form for approval at the next meeting on August 29.

Upon all the facts poured into the record, the position of the defendant apparently was that it had begun converting "B" wholesalers to regular retail contracts at the end of 1948, and that the plan to go retail with the "A" distributors did not germinate until August

"B" Distributors
"90 Reclassified as Retail Distributors after December 1, 1948 with no change in price structure.
14 Franchises terminated between March 21, 1947 and November 19, 1949 and not renewed.
2 Franchises terminated after November 19, 1949 and not renewed.

——
106"

"A" Distributors
"7. Refranchised as 'A' Distributors during 1949 because of change of name, change in organization or territory.
2 Refranchised as Retail Distributors whose 'A' Distributor franchises were terminated prior to March 1, 1948.
1 Refranchised as Retail Distributor whose former 'A' Distributor franchise was for the sale of stokers only.
40 Franchises terminated between March 3, 1942 and November 19, 1949, and not renewed.
98 Refranchised as Retail Distributors after November 19, 1949, in accordance with change in national distribution policy adopted August 25, 1949.
17 Franchises terminated after November 19, 1949 and not renewed.
2 Reclassified as Retail Distributors before November 19, 1949.

——
167"

1949. The position of the plaintiff on the other hand was that a complete conversion was conceived in 1948, and that it was to be carried out in two steps, first the "B's", then the "A's".[9]

Although the uniform testimony of the General Motors and Delco officials was that there was no policy of switching to direct retailing in February, 1949, the cross-examination revealed enough debatable facts about rights under the various contracts and the termination dates, that the jury could find that at the time of the alleged promises in February, the defendant had an existing policy of switching from wholesale to retail distribution.

Several Minnesota cases discuss the sufficiency of evidence necessary to support a jury finding of an intent not to perform, see Wojtkowski v. Peterson,

9. This is summed up in the recross-examination of Mr. Rutherford, General Manager of Delco:

"By Mr. Rerat:

"Q. Now, I just want to show you this exhibit (Defendant's Exhibit T) that you made; as I understand it, you started to change this proposition from wholesale distributors to retail distributors, as you said, in January of 1949, and then you started, you first started on the 'B' wholesale distributors, did you not? A. Yes.

"Q. Yes, and then you probably started on those first because they were easier to switch over from wholesale distributor contracts or agreements to retail agreements? A. No that isn't the reason.

"Q. Is that right? A. No, that is not the reason.

"Q. And then after you had all of the 'B' distributors, practically signed up to retail distributors, then you started on the 'A' distributors, did you not, as shown —as reflected in this exhibit? A. Those were two different programs, two entirely different programs.

"Q. Yes. Now, it shows that—it shows on here that you—at the time that you finished with your 'B' distributors that you immediately, you almost started immediately on your 'A' distributors, did you not, and wasn't that done because the 'A' distributors were probably a little harder to convince than the 'B' distributors? A. No it was not."

1951, 234 Minn. 63, 47 N.W.2d 455; Powers v. American Traffic Signal Corp., 1926, 167 Minn. 327, 209 N.W. 16, but most of them are inappropriate. The closest is a federal case from this Circuit, Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co., 8 Cir., 1933, 64 F.2d 834. There Judge Gardner found sufficient evidence to support the jury's finding of an intent not to perform promises of continuing the plaintiff's distributorship, primarily in that the plaintiff was induced to undertake an expensive promotional campaign, the benefit of which was lost by the defendant's cancellation, and also in that the defendant made offers of the distributorship to other people shortly after the promises to the plaintiff were made.

The facts here are certainly less convincing than those in the Philadelphia Storage case, but I am not persuaded that the issue was not properly one of fact for the jury.

The, motion for judgment notwithstanding the verdict is denied.

### New Trial

While I have had some hesitating moments in denying defendant's motion for a directed verdict on the various grounds alleged, and have done so out of respect for the findings of the jury and a recognition of the principle that motions for directed verdicts should be "cautiously and sparingly" granted (Hanson v. Ford Motor Co., 8 Cir., 278 F.2d 586), I have no hesitation in granting the defendant a new trial. Absent its motion, I would have done so.

It is abundantly clear to me that the verdict was against the clear weight of the evidence. The proof of damages was inadequate and the verdict of $100,000 is grossly excessive.

The evidence of intent to deceive the plaintiff, even assuming the claimed representations were actually made, was minimal—just enough to avoid the granting of the requested directed verdict. Even the evidence showing the making of the alleged promises was far outbalanced by the defendant's testimony and exhibits to the contrary.

Defendant's expert witness, Russell Nelson the C.P.A., stated that in his opinion plaintiff had lost good will of $400,000, which ultimately proved to be nothing more than his estimate of the gross profits plaintiff would have made in the next five years if its franchise had not been cancelled. Prospective gross profits are not the measure of damages in this case. Cf. Ken-Rad Corp. v. R. C. Bohannan, Inc., 6 Cir., 1947, 80 F.2d 251, 254; Rice v. Price, Mass.1960, 164 N.E.2d 891. Neither he nor any other witness explained the formula or method of reaching this figure within either the normal concept of good will or within the "out of pocket" rule governing us here. See Emich Motors Corp. v. General Motors Corp., 7 Cir., 1950, 181 F.2d 70, 83–84; Baker Co. v. Ballantine & Sons, 1941, 127 Conn. 680, 20 A.2d 82, 137 A.L.R. 916; Pett v. Spiegel, Sup. 1923, 202 N.Y.S. 650.

At all events, the verdict of $100,000 is clearly excessive in the light of all the evidence, especially that concerning the sales and past profits of the plaintiff, the size of its operation, and the amounts of defendant's subsequent sales in plaintiff's former territory.

The Court is of the view that a new trial is necessary to prevent a miscarriage of justice.

A new trial is granted.