[Civ. No. 24664. Second Dist., Div. One. Apr. 18, 1961.]

TITLE INSURANCE AND TRUST COMPANY (a Corporation), as Coexecutor, etc., et al., Appellants, v. AFFILIATED GAS EQUIPMENT, INC. (a Corporation) et al., Respondents.

Hindman & Davis, George L. McCormick and E. Eugene Davis, Jr., for Appellants.

Moss, Lyon & Dunn, Sidney A. Moss, Henry F. Walker, Murchison, Cumming & Baker and John Baker for Respondents.

WOOD, P. J.—This is an action to recover property damages resulting from a fire which allegedly was caused by the negligent manufacture and installation of a furnace.

The jury returned a verdict in favor of the defendants Kriwanek, individually, and Carl P. Kriwanek, doing business as La Brea Heating and Air Conditioning Company. (Those defendants will be referred to as defendant La Brea.) The jury also returned a verdict against defendant Affiliated Gas Equipment, Incorporated, a corporation, for $55,331.04. (That defendant will be referred to as defendant Affiliated.) Defendant Affiliated made a motion for judgment notwithstanding the verdict or in the alternative for a new trial. That motion was granted, and judgment notwithstanding the verdict was entered in favor of defendant Affiliated. Also, an order was made granting a new trial to Affiliated. Judgment upon the verdict was entered in favor of defendant La Brea. Plaintiffs' motion for a new trial as to defendant La Brea was denied.

Plaintiffs appeal from the judgment in favor of defendant La Brea; and they appeal from the judgment notwithstanding the verdict, and from the order granting a new trial, as to defendant Affiliated.

Plaintiff Milton Kauffman died prior to the trial, and the Title Insurance and Trust Company and Thomas C. Webster, executors of the will of Mr. Kauffman, were substituted as plaintiffs in the place of Mr. Kauffman.

Mr. and Mrs. Kauffman owned residential property in Los Angeles consisting of two adjoining lots—on the front lot there was a dwelling house, and the rear lot was vacant. In 1953 they constructed a recreation or play room on the rear lot. The heating equipment for the room consisted of a Payne Counter Flow Forced Air Furnace and the ducts, wires, motor, thermostat, and other associated appliances necessary to complete the heating system. Mr. and Mrs. Kauffman purchased the furnace from defendant La Brea. Defendant La Brea

purchased the furnace from defendant Affiliated. When La Brea received the furnace it was crated, and La Brea transported it to the Kauffman property where it was uncrated and installed by La Brea. The furnace was manufactured by Affiliated. Some of the parts of the furnace which were used by Affiliated in making the furnace were made by other companies which are not parties herein. The installation of the furnace was commenced on August 5, 1953, and was completed on December 4, 1953. The construction and furnishing of the room was completed thereafter in December.

On Christmas morning, in 1953, the Kauffmans attempted to use the furnace for the first time. The thermostat was turned to 75 degrees but the heat did not come on, and they returned to their main residence. The next time they tried to use the furnace was January 15, 1954, in the evening, and on that occasion the thermostat was set between 70 and 75 degrees. The room became very warm and the thermometer indicated about 90 degrees. Mrs. Kauffman turned the thermostat down and attempted to shut off the furnace, but it did not shut off and the room kept getting hotter and hotter. Mr. Kauffman telephoned La Brea and said that the furnace would not turn off. La Brea told him to pull the electric plug from the wall outlet. Then the plug was disconnected, but the furnace continued to produce heat and make noise. Mr. and Mrs. Kauffman and an employee (Mrs. Asbury) saw smoke coming from "the cold air duct" or register. The smoke was filling the room. Mr. Kauffman called the fire department, and firemen came and shut off the gas supply to the furnace, and removed the smoke from the room by using smoke ejectors. Captain Huff, who was in charge of that crew of firemen, testified that when he arrived there the gas in the furnace was burning, the thermostat was in the "off position," the electrical cord was disconnected from the outlet plug in the wall, smoke was in the room, and the grill on the cold-air return register (near the ceiling) was so hot that it could not be removed by bare hands; he told Mr. Kauffman not to use the heater (furnace) again until it had been checked by the heater company.

The next day, January 16, 1954, Mr. Kauffman sent a telegram to defendant La Brea, which stated as follows (excluding addresses) : ". . . Furnace installed by your company caught fire at 9:40 p.m. Friday. Your night man refused to come.

County Fire Department has full report on damages. Ask that your representative be here Tuesday at 10:00 A.M. . . ."

On January 19 defendant Carl Kriwanek and another man went to the Kauffman room in response to the telegram, and they "worked on the furnace" that day.

On January 20 Mrs. Kauffman turned the thermostat to approximately 72 degrees, but the heat did not come on. Then Mr. Kauffman sent another telegram to defendant La Brea, which stated as follows (excluding addresses) : ". . . Furnace does not work, necessary that we have heat at once." On that day an employee of La Brea went to the Kauffman room, worked on the furnace, and placed a longer belt on the "blower" motor. The employee tested the operation of the furnace several times to see whether the controls were operating properly and to see if the "solenoid" valve (diaphragm or magnetic valve) was operating properly. He told the Kauffmans that the furnace was all right and that he had fixed it. On January 21 La Brea replaced a pilot light on the furnace.

The furnace was not used again until the afternoon of January 23, when two employees of the Kauffmans were cleaning the room. One of them turned the thermostat up to approximately 75 degrees and the heat came on. They remained in the room about an hour and a half, and then one of them turned the thermostat to the "off" position.

The next day, January 24, about 9 a. m., while Mrs. Kauffman was in the main part of their residence and was looking through a window toward the recreation room she saw smoke and small flames coming from the northwest corner of the recreation room (the corner where the furnace was located). About that same time one of the Kauffman employees, who was in the kitchen of the main residence, saw smoke and flames coming from the northwest corner of the recreation room. The employee unsuccessfully attempted to extinguish the fire with a bucket of water. According to the testimony of Mrs. Kauffman, the place near the northwest corner, where the small flames were, "combusted" and "blew up with a bang" and suddenly flames shot everywhere and the entire room became "involved" in flames. Firemen arrived there within a few minutes, but the room and contents were destroyed by the fire.

Captain Huff, called as a witness by plaintiffs, testified that he was in charge of the fire fighting operations at the

time the room burned; he had investigated the origins of fires hundreds of times; that, as a part of his duties as fire captain, he conducted an investigation to determine the point of origin of this fire; in his opinion the fire started in the attic which contained "the cold return duct to the heater"; in his opinion the source of ignition and cause of the fire was the heater (furnace) or the installation of the heater.

Fire Chief Manchester of the Los Angeles County Fire Department, called as a witness by plaintiffs, testified that he had had several years of experience in investigating and determining the origin and cause of fires; he began an investigation at the Kauffman property about three days after the fire; the building had been completely involved in a severe fire—"the building was gutted by fire"; in his opinion the point of origin of the fire was adjacent to the cold air return duct in the attic above the furnace where the duct had been heated to an extremely high temperature and was in contact with wood members of the building; in his opinion the cause of the fire was either the malfunction of the furnace or a malfunction of a component part of the furnace.

Mr. Carl A. Halter, called as a witness by the plaintiffs, testified that he is a fire investigator; from 1923 to 1949 he was a member of the Los Angeles Fire Department, and he retired from that position with a captain's rating; he has had many years experience in investigating and determining the origin and cause of fires he investigated; the next day after the Kauffman fire he began an investigation to determine the cause of the fire; in his opinion the origin of the fire was the fresh air return duct above the furnace; the furnace is a "counterflow design" and the fresh air return duct "is expected to draw in no hot air but only air from the room which is to be heated" and the duct may be installed without insulation; in this instance the fresh air duct was so installed, and it was held in place by being fastened to a wooden structure which normally would be no warmer than the room temperature; when, however, the mechanical devices in the furnace do not work properly nature takes its course and the heat rises and makes a hot air duct out of the intended cold air duct, and the wooden structure to which the duct is fastened is subjected to heat which is great enough to set the wood afire; that is what happened in this case; in his opinion the furnace caused the fire.

About three or four days after the fire, while Captain Huff and Chief Manchester were at the Kauffman property and while representatives of La Brea and Affiliated were also there, the furnace was dismantled by some of those persons in the presence of all those persons. The furnace and its component parts were placed in the custody of Captain Halter. While those things were in his custody, representatives of La Brea made further inspections of those things; and also Captain Halter and an electrical engineer made further inspections thereof.

Mr. Donald Bentley, called as a witness by plaintiffs, testified that he had a degree in petroleum engineering; he had been employed by the Southern California Gas Company, the old Payne Furnace Company, and General Controls; from his experience with those companies, he acquired a general knowledge of the different types of gas valves that are used on furnaces; he tested the pressure regulator of the furnace herein and found that it functioned properly; he tested the magnetic diaphragm gas valve by using equipment in his laboratory. (The attorneys for defendants objected to testimony by him as to the results of his tests—the objections were made principally upon the ground that the tests were not made under conditions that were substantially the same as conditions prevailing before the fire. The objections were sustained.) Mr. Bentley testified further that he took the magnetic diaphragm apart in order to inspect the inside of it; while he was disassembling the valve, Captain Halter was present; a small particle of wood and some metal chips, which appeared to be aluminum, were in and around the interior and working parts of the valve; he (witness) also observed that there was a burr or malformation at the top of the hole in the control portion of the valve and the square movable pin in the hole did not move freely therein.

A label or nameplate, which was on the top of the magnetic diaphragm valve, stated: ''Magnetic Diaphragm Valve . . . Payne Furnace Division, Affiliated Gas Equipment, Inc.'' The label or nameplate was fastened thereon by two screws. The parts of the valve were held together by several screws. The heads of the screws were covered or sealed with red paint so that the screws could not be removed without breaking the paint.

Mr. Hiskey, a witness called by defendant Affiliated, testified that he is an engineer for the Smith-Emery Company;

he was employed by the Southern California Gas Company as a chemist and engineer from 1922 to 1940; he has studied the operation of all types of gas furnaces and appliances; at the request of defendant Affiliated, he went to the Kauffman property on January 28, 1954, and made an investigation of the premises where the fire occurred; he could not determine the cause of the fire.

Mr. Hiskey testified further regarding his observations at the scene of the fire and regarding the manner in which a counterflow gas furnace operates.

Affiliated did not present any testimony other than the testimony of Mr. Hiskey. La Brea did not offer any testimony.

A general description of the normal operation of the kind of furnace involved here is as follows: The furnace, which is designated a "counterflow" furnace, causes the air in the heater system to circulate contrary to the laws of nature in that the furnace forces the heated air down through the interior of the furnace, and under the floor, and through outlets in or near the floor of the room which is to be heated. The air is forced by a fan or blower which is operated by an electric motor. The furnace draws return or cool air (by means of the fan) through a register which is near the ceiling, and that air goes through the heating compartment of the furnace and is forced or blown through the floor ducts as above stated. The heating cycle of this kind of furnace is controlled by a thermostat. The furnace burns gas and is operated by electricity. The electricity for operating the furnace is obtained by plugging an electric cord in an ordinary wall outlet. The electric motor which operates the fan or blower is connected with the house electric current but the control circuit is reduced to 24 volts by a transformer. The furnace contains automatic controls or limit switches which are actuated by a change in temperature, so that, if the furnace overheats, the electric circuit to the magnetic diaphragm valve will be opened by a limit switch, causing the gas supply to be shut off. The magnetic valve, if operating properly, shuts off the gas supply whenever the electricity supply to it is cut off. If the electricity is disconnected by pulling the plug from the wall outlet, the furnace will not operate and gas will not flow to the burners. When the electrical energy is removed or not applied to the magnetic diaphragm valve, the gas pressure above and below the diaphragm is equalized and a small cir-

cular weight attached to the top center of the diaphragm presses the diaphragm against the intake pipe, thereby holding the pipe closed by force of gravity. When electrical energy is applied to the valve, a small inner three-way pilot valve is operated by an electrical magnet, causing a square pin in a round hole to move downward. The pilot valve performs a double function of sealing off the gas pressure to the chamber above the diaphragm and allowing the small quantity of gas in the upper chamber to bleed off, thereby causing an unequal pressure on the flexible diaphragm, which allows the incoming gas to force the diaphragm away from the intake pipe, thereby allowing passage of gas through the valve to the burners. When the electrical energy is removed from this magnetic diaphragm valve, the magnet is deenergized and a small spring raises the square pin in the three-way pilot valve, allowing gas to flow into the upper chamber, equalizing the pressure on both sides of the diaphragm. This again allows the weight of the diaphragm to close the valve by force of gravity. If the magnet is not energized, the square pin should be raised by the spring, but if the square pin in the three-way pilot valve sticks or stays in the down position, the magnetic diaphragm gas valve will remain in the open position and allow the full flow of gas to pass to the burners.

There are five alleged causes of action in the amended complaint. In the first cause of action it is alleged that about December 10, 1953, the defendant La Brea sold to plaintiffs and installed in their dwelling house a Payne forced air furnace, together with associated electrical equipment pertaining to said heating system; that said installation was so negligently made that as a proximate result thereof a fire was caused in said house on January 24, 1954; that the fire spread throughout the house and garage, causing them to be destroyed and damaging plaintiffs in the amount of $55,686.66.

In the second cause of action it is alleged, in part, that said Payne furnace was new and was manufactured by defendant Affiliated; Affiliated was negligent in manufacturing the furnace and in testing the same; Affiliated negligently failed to make proper inspections and tests of the materials and workmanship used in constructing the furnace; at the time the furnace was installed in plaintiffs' house, the furnace was in a dangerous and defective condition; if Affiliated had inspected and tested the furnace said defendant would have discovered the defective condition thereof; on January 24, 1954, as a

proximate result of said negligence the furnace caught fire and the fire destroyed plaintiffs' house, garage, and personal property to plaintiffs' damage in the amount above stated.

In the third cause of action it was alleged, in part, that La Brea recommended to plaintiffs that they have a Payne forced air furnace installed in their house; La Brea possessed unusual skill and knowledge of the proper type of furnace to be used and of the proper installation and operation of such a Payne furnace; plaintiffs possessed no skill or knowledge as to whether the furnace was fit for the purpose aforesaid; plaintiffs relied upon the statements of defendant La Brea and upon La Brea's knowledge and judgment that the furnace was fit for said purpose; during December 1953, La Brea sold and delivered the furnace to plaintiffs and expressly warranted and represented by oral statements to plaintiffs that the furnace was safe and fit for the purpose of heating plaintiffs' house; La Brea further expressly warranted that it would install the furnace and entire heating system according to good standards in the heating industry; in reliance upon said express warranties, plaintiffs purchased the furnace from La Brea; plaintiffs paid La Brea for said furnace and the installation thereof; the furnace was dangerous, defective, and not reasonably fit for said purpose; the furnace caused a fire on January 24, 1954, which spread throughout plaintiffs' house and as a result thereof plaintiffs' property was damaged as above stated.

In the fourth cause of action plaintiffs realleged the allegations of the third cause of action, except the allegations that La Brea "expressly" warranted the furnace and the installation thereof. In the fourth cause of action plaintiffs alleged further that La Brea warranted the furnace to be fit and safe for use in plaintiffs' house.

In the fifth cause of action it was alleged, in part, that in December 1953, plaintiffs desired to purchase a safe gas heating system; they read advertising and pamphlets issued by the Payne Furnace Division of defendant Affiliated Gas Equipment, Incorporated, wherein said defendant Affiliated warranted and stated that Payne forced air heating fits any home and is "100% health and safety protection . . . built flame-proof, fire-proof . . . ," and is "Fully guaranteed in writing . . . ," and "Payne the greatest name in heating . . . overheating, underheating and other comfort and safety

factors completely and accurately controlled by Payne's *Magic Brain*—24 volt gas activated diaphragm valve''; that Affiliated possessed unusual skill and knowledge as to the proper installation and use of said Payne heating system; plaintiffs possessed no skill or knowledge as to whether said system was fit for said purpose or whether it was as represented or warranted by said defendant; plaintiffs relied upon Affiliated's statements, representations, skill, and knowledge; plaintiffs purchased a Payne forced air heating system manufactured by defendant Affiliated, and had said system installed in their house about the middle of December, 1953; defendant Affiliated expressly warranted and represented to plaintiffs that said heating system was safe and fit for the purpose of heating plaintiffs' house, and that it would not constitute a fire hazard; in reliance upon said statements and warranties, plaintiffs purchased said heating system; the system was installed in plaintiffs' house but the system was unsafe, defective, and not fit for said purpose; it was not flame-proof or fire-proof; it overheated, and the safety controls failed to function; on January 24, 1954, a fire was caused by said heating system, and plaintiffs' house and personal property were damaged in the amount above stated.

In summary, the respective five causes of action were to the following effect: The first cause of action alleged *negligence* of La Brea *in installing* the furnace. The second alleged *negligence* of Affiliated in *manufacturing* the furnace. The third alleged breach of *express* warranty by La Brea. The fourth alleged breach of *implied* warranty by La Brea. The fifth alleged breach of *express* warranty by Affiliated.

At the beginning of the trial the defendant Affiliated made a motion to dismiss the fifth cause of action (relative to express warranty) on the ground that that alleged cause of action did not state a cause of action in that it was not alleged therein that plaintiffs gave the defendant Affiliated notice of breach of warranty. Also, at that time the defendant La Brea made a similar motion as to the third and fourth causes of action (relative to express and implied warranties). Thereupon, the plaintiffs made a motion for permission to amend those causes of action (third, fourth, and fifth) by alleging therein that plaintiffs gave the defendants due notice of breach of warranty. The motion to amend was denied. The motions to dismiss were granted, and the third, fourth, and fifth alleged

causes of action were dismissed. The trial proceeded upon the first and second causes of action which pertained to alleged negligence.

As above stated, the verdict was in favor of La Brea, and was against Affiliated. Affiliated's motion for judgment notwithstanding the verdict was granted. Also Affiliated's motion (in the alternative) for a new trial was granted.

 Appellants (plaintiffs) contend that the court erred in dismissing the third, fourth, and fifth alleged causes of action. An essential element of a cause of action for damages for breach of warranty is an allegation that the plaintiff gave notice of the breach of warranty to the defendant within a reasonable time after the breach. (*Vogel* v. *Thrifty Drug Co.*, 43 Cal.2d 184, 187 [272 P.2d 1].) In the present case it appears that such an allegation was not in the third, fourth or fifth alleged causes of action, and consequently each of those alleged causes of action failed to state a cause of action for damages for breach of warranty. In the original complaint in the Vogel case, *supra*, the plaintiff sought damages on the basis of negligence of defendant in serving ice cream that contained pieces of glass. The complaint therein was amended to allege additional damages. At the trial therein the plaintiff made a motion for permission to amend the amended complaint by filing a proposed amendment based upon the theory of implied warranty. The proposed amendment did not contain a direct allegation, or allege facts from which an inference could be drawn, that notice of breach of warranty had been given. The motion to amend was denied. It was said therein, at page 187: "Plaintiff urges that she should have been permitted to file her proposed amendment . . . and that in any event all of the facts necessary to support a recovery upon that theory as well as upon the theory of negligence were set forth in the amended complaint . . . and that she was therefore entitled to have the warranty theory submitted to the jury. But in making this argument plaintiff overlooks an element essential to stating a cause of action for breach of the implied warranty, i.e., an allegation that plaintiff gave notice of the breach to the defendant within a reasonable time. Section 1769 of the Civil Code provides that 'In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for

breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor.' '' It was also said therein at page 188 : '' 'The clear and practically unbroken current of authority establishes the doctrine that the requirement of notice, to be given by the vendee charging breach of warranty is imposed as a condition precedent to the right to recover, and the giving of notice must be pleaded and proved by the party seeking to recover for such breach.' ''

In that case, as above shown, the original complaint and amended complaint alleged negligence only, and there was no attempt prior to the trial to allege breach of warranty. As indicated therein, the proposed amendment sought to add a new cause of action on the theory of breach of warranty, and even if the amendment as proposed had been allowed, a cause of action on the theory of breach of warranty would not have been stated because the proposed amendment did not allege the giving of notice of breach of warranty. It thus appears that the motion therein to file the proposed amendment was denied because the amendment related to a new and different cause of action and did not allege the giving of notice, and because the amendment was not offered for filing until the day of trial. In the present case, the first and second causes of action were based on negligence, and in addition to those causes of action the plaintiffs herein attempted to allege three additional causes of action on the theory of breach of warranty, but, as above stated, those three purported causes of action failed to state causes of action because they did not allege the giving of notice of breach of warranty. Appellants (plaintiffs) herein assert that they should have been permitted to amend said three purported causes of action by interlineation to allege the giving of notice. They argue to the effect that under the circumstances here the matter of the amendment was technical and of a minor nature, and it did not cause any surprise to defendants; that defendants would not have been prejudiced thereby for the reasons that the matter of breach of warranty had been alleged in the three purported causes of action and had been considered at the pretrial conference, and that the pretrial statement of defendants referring to warranties was incorporated in the pretrial order. The pre-

trial order stated, in part: "The parties hereto have each filed their own pretrial statements . . . the Court hereby refers to defendants' pre-trial statement, as amended by the Court in line 32 of page 1, and incorporates said pre-trial statement herein by reference . . . as a fair statement of the contentions of the parties, their stipulations and the issues to be tried." The pretrial statements of defendants, so referred to in the pretrial order, recited, in part: "The issues will be the negligence of the defendants, the existence of any express warranties, the existence of any implied warranties, the breach of any warranty, proximate cause, contributory negligence on the part of the plaintiffs, and damages." Under the circumstances here it is apparent that defendants were not taken by surprise by plaintiffs' motion to amend. While the attorneys and the judge were in chambers, at the time said motions for dismissal were made and argued, the judge asked counsel for plaintiffs what his evidence would be as to notice of breach of warranty. Counsel for plaintiffs replied, "Two telegrams." Then the judge asked counsel for plaintiffs if there was evidence of notice to Affiliated (Payne). Counsel for plaintiffs said: "Not that I can think of right now." Then the judge said: "Then you couldn't prove anything as against Payne [Affiliated]." Counsel for plaintiffs said: "Not until after the fire." Counsel for plaintiffs also said: "Your Honor, both these people [apparently referring to defendants] were tramping all over the premises investigating the thing a couple of days after the fire." He also said: "I don't have any personal records in my file," and "We may not be able to prove notice." Of course, at the time counsel for plaintiffs referred to two telegrams, the telegrams which Mr. Kauffman sent to La Brea had not been offered or received in evidence. Presumably, counsel for plaintiffs was referring to those two telegrams when he replied to the judge's question relative to evidence of notice. It is true that those telegrams were sent before the fire destroyed the house and contents, but it would seem that those telegrams to La Brea which called attention to the alleged defective furnace prior to the fire would afford La Brea a better opportunity to investigate the alleged defect than would be afforded by such a telegram after the fire. There was evidence that representatives of La Brea and Affiliated were at the scene of the fire within a few days after the fire occurred and they made investigations there. While counsel and the judge were in chambers, at the time said motions to dismiss

were made and argued, counsel for Affiliated said that when this case first came to the office, they wrote a letter to Affiliated stating that a cause of action for breach of warranty had not been stated. It thus appears that at the time of pretrial the matter of no cause of action being stated (as to said three purported causes of action) was a matter within the contemplation of Affiliated. It is not necessary to determine appellants' contention to the effect that the pretrial order was controlling and meant that an issue at the trial would be whether there was a breach of warranty. In view of the pretrial order and the pretrial statement of defendants that the issues would include "the existence of any express warranties, the existence of any implied warranties, the breach of any warranty," the appellants (plaintiffs) were justified in assuming that the pretrial had settled the issues and that an issue at the trial would be breach of warranty as purportedly alleged. In any event, in view of the pretrial order and the pretrial statement of defendants, and in view of all the factual circumstances herein, the appellants should have been allowed to amend the three purported causes of action to allege the giving of notice of breach of warranty. Consequently, the court erred in dismissing the third, fourth, and fifth purported causes of action.

Appellants also contend that the court erred in granting the motion of defendant Affiliated for judgment notwithstanding the verdict. In *Reynolds* v. *Willson*, 51 Cal.2d 94 [331 P.2d 48], it was said (p. 99) that a motion for judgment notwithstanding the verdict "may be granted only if a motion for a directed verdict should have been granted. . . . The power of the court to direct a verdict is subject to the same limitations as its power to grant a nonsuit. . . . A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, . . . the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. . . . In conformity with the foregoing rules the main if not the only problem presented is whether (disregarding all conflicting evidence favorable to the defendants), there is sufficient substantial evidence to support the verdict on any tenable theory of liability."

In the present case there was evidence that on January 15, 1954, when the thermostat was set between 70 and 75 degrees the room became very much overheated and

kept getting hotter, and the furnace could not be turned off by turning the thermostat down or by pulling the electric plug from the wall outlet. Smoke came from the cold air register and filled the room. It was necessary to call the fire department, and firemen came and shut off the gas supply to the furnace, and removed the smoke from the room. On January 24 Mrs. Kauffman and one of the Kauffman employees saw smoke and flames coming from the corner of the room where the furnace was located. Mrs. Kauffman saw that corner of the room blow up "with a bang" and saw flames shoot everywhere and cover the entire room. Captain Huff, of the fire department, testified that in his opinion the cause of the fire was the heater or the installation of it. Chief Manchester testified that in his opinion the cause of the fire was the furnace. Mr. Halter, a fire investigator who was formerly a captain of the fire department, testified that in his opinion the furnace caused the fire. There was evidence that foreign substances, namely, a particle of wood and some metal chips, were in and around the interior and working parts of the magnetic valve; and that a burr or malformation was at the top of a hole in the control portion of the valve. Mr. Hiskey, the only witness called by defendant Affiliated and who was a chemist and engineer, testified that he could not determine the cause of the fire. It thus appears that there was substantial evidence from which the jury could find that the defendant Affiliated was negligent in manufacturing and inspecting the furnace, or in manufacturing or inspecting it. The court erred in granting the motion for judgment notwithstanding the verdict.

▮▮ Appellant also contends that the court erred in granting Affiliated's motion for a new trial. One of the grounds upon which the motion was granted was insufficiency of the evidence to justify the verdict against Affiliated. In determining this contention it will not be necessary to refer again specifically to the evidence. ▮▮▮ In *Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305, it was said, at page 307 [163 P.2d 689] : "It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court [order granting new trial]." ▮▮ In the present case the court did not err in granting defendant Affiliated's motion for a new trial.

The judgment notwithstanding the verdict is reversed. The order granting the motion of defendant Affiliated Gas Equipment, Inc., a corporation, for a new trial is affirmed. Judgment for defendants Carl P. Kriwanek, John P. Kriwanek, and Frank P. Kriwanek, as copartners, doing business as La Brea Heating and Air Conditioning Company, is reversed.

Fourt, J., and Lillie, J., concurred.

Petitions for a rehearing were denied May 5, 1961, and respondents' petitions for a hearing by the Supreme Court were denied June 14, 1961.