JOHN O. TRUESDALE AND ANOTHER, d.b.a. MIDWAY TRUCK STOP, AND ANOTHER v. HYMAN J. FRIEDMAN AND OTHERS.

132 N. W. (2d) 854.

January 15, 1965—No. 39,171.

*Leonard, Street & Deinard, Harold D. Field, Jr.,* and *Jeremy C. Shea,* for appellants.

*Firestone, Fink, Krawetz, Miley & O'Neill* and *Joseph T. O'Neill,* for respondents.

NELSON, JUSTICE.

The action was brought by plaintiffs to recover damages for the alleged fraud of appellants-defendants in sales of gasoline to plaintiffs. Defendants are sellers and distributors of petroleum products, Hyman J. Friedman, the individual defendant, being a stockholder and director of the corporate defendants.

Plaintiffs earlier moved this court to dismiss the appeal for the failure of defendants to print an adequate record or else to limit the appeal to those issues not involving the sufficiency of the evidence. This motion was denied, subject to the right of plaintiffs to renew it at the time of oral argument. Truesdale v. Friedman, 267 Minn. 402, 127 N. W. (2d) 277.

At the close of the trial the trial court held that fraud had not been proved and, over the objection of both counsel, submitted the case to the jury on a breach of warranty theory. The jury returned a verdict for plaintiffs in the amount of $14,500. Defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion for a new trial was denied unless plaintiffs refused to accept a remittitur from the verdict in the amount of $4,500, thereby reducing the judgment to $10,000. Plaintiffs accepted the remission and defendants therefore appeal from the order.

In June 1955 plaintiff John O. Truesdale purchased Midway Truck Stop, a gasoline service station in St. Paul, and he and his wife, plaintiff Charlotte Louise Truesdale, began operating it on June 1, 1955. Mr. Truesdale, hereinafter referred to as plaintiff, learned from the former owner that defendant Friedman, hereinafter referred to as defendant, was a distributor of petroleum products and had been supplying Midway Truck Stop prior to the purchase. Plaintiff then contacted defendant, and during the first 3 weeks of June 1955 they engaged in various conversations concerning the possibility of defendant's con-

tinuing to supply Midway Truck Stop with petroleum products. These discussions culminated in an oral agreement between plaintiff and defendants under which defendants were to supply plaintiff with regular and ethyl gasoline directly from a pipeline which supplied sellers of major brands such as Phillips 66 and Skelly. The agreement is admitted by defendant.

From June 1, 1955, through June 2, 1957, defendant was plaintiff's sole supplier of gasoline. From June 2, 1957, to November 1957, plaintiff continued to purchase gasoline from him but not on an exclusive basis. During this 2½-year period plaintiff purchased 460,539 gallons of regular and 62,363 gallons of ethyl gasoline from defendants.

Plaintiff testified that before the agreement was made defendant told him that the gasoline was coming directly from the Great Lakes Pipeline on County Road C and Cleveland Avenue, St. Paul, and that he could go there to see it for himself. Subsequently plaintiff went to the pipeline and saw trucks belonging to defendants, Skelly, and Phillips 66 being filled with gasoline from it. The claim of fraud is based on defendant's statement that he would supply plaintiff with regular and ethyl gasoline which came directly from the pipeline used by suppliers of major brands. In his complaint plaintiff alleges that defendants did not supply him with gasoline directly from the pipeline but mixed the regular and ethyl gasoline with inferior petroleum products before delivery to plaintiff; that the blended gasoline was worth $.06 less per gallon and that plaintiff was thereby damaged in the amount of $31,380.12. Plaintiff alleged that his loss of business amounted to $10,000 and also sought exemplary damages in the amount of $20,000.

Defendant's records indicate that on 10 occasions he sold to plaintiff regular gasoline blended with natural gasoline. He testified that he supplied the blended gasoline to plaintiff during gas price wars, at plaintiff's request, and that it was sold to plaintiff at a discount. Plaintiff denies that he ever requested blended gasoline or that he ordered it. There was no written evidence produced which substantiates defendant's claim that he sold blended gasoline to plaintiff at a discount.

Invoices showing all deliveries of petroleum products by defendant to

plaintiff from June 1955 through November 1957 were introduced as exhibits by plaintiffs. No invoice shows any representation other than "R" for regular and "E" or "P" for ethyl or premium gasoline.

From June 1956 through November 1957 defendant purchased 320,000 gallons of natural gasoline. It appears from the record that all natural gasoline received by him was used for blending purposes. Defendant testified that the natural gasoline was blended with both regular and ethyl but denies delivering blended ethyl to plaintiff. While defendant admits delivering blended regular to plaintiff on nine occasions, he denies positively delivering anything but unadulterated pipeline ethyl to plaintiff.

Defendant's accounting procedure was as follows: His drivers would go to the pipeline and have the tank filled with the amount of gas which defendant requested. A "manifest" indicating the number of gallons of ethyl or regular gasoline procured would be given to defendant's drivers. Defendant's drivers would then go to defendant's customers and the customers' needs would be fulfilled. In each case the driver would then fill out an invoice ticket, giving one copy to the customer and stapling one to the manifest. The manifest and invoices were then returned to defendant and by examining the invoices he could determine to whom and in what quantities the gasoline represented by the manifest had been sold.

One of defendant's former truckdrivers, Floyd Hill, testified that on one occasion (he could not remember the date) plaintiff had ordered ethyl but that prior to the delivery he had run out of ethyl. He called defendant and so informed him and asked for advice. Defendant told him to give plaintiff regular. Hill followed orders and was in the process of pumping regular into plaintiff's tank when plaintiff came out. He lifted up the hose and discovered the gas being pumped in was white. (Ethyl is red.) Hill testified that plaintiff then went into the station and called defendant. Under cross-examination Hill testified that plaintiff came out and said defendant would take care of it.

Defendant testified that the cost of natural gasoline was 1 to 1½ cents below that of regular gasoline. Invoices disclosed that on June 10, 1957, regular gasoline cost 12.75 cents per gallon, transportation

from Texas included. About the same date natural gasoline was 5.75 cents per gallon, transportation from Texas excluded. Defendant claims the difference between the prices represented transportation costs and loading and unloading costs. The loading and unloading costs were ½ cent per gallon.

To support their allegation concerning loss of business, plaintiffs introduced one witness, Ed Engdahl, who testified that he was in the trucking business and had purchased diesel fuel and gasoline from plaintiff. In the early part of 1957 he purchased a 1957 Buick and began to purchase ethyl for it from plaintiff. His Buick "pinged" and rattled on this ethyl but did not when he used Mobil ethyl. He discontinued purchasing ethyl from plaintiff but continued to buy his other fuel needs from him. Plaintiffs failed to introduce evidence showing a decline in profits, and the trial judge ruled that they had not proved loss of business and therefore could not recover consequential damages.

Defendant testified that the percentage of natural gasoline in the blended gasoline ordinarily varied from 10 to 15 percent. Defendant's expert testified that all gasoline has some natural gas in it, one of the major brands using from 25 to 35 percent, and that at the Great Lakes Pipeline the percentage between 1955 and the time of trial was from 5 to 8 percent of the total product. He said also that the advantage of adding natural gasoline to regular is that it gives proper starts, particularly in winter, since in colder weather and in northern latitudes the gasoline has to have enough volatility (which natural gasoline furnishes) so that it will properly vaporize in the carburetor. He also testified as to its use for combatting gumming tendencies when added to regular gasoline.

Plaintiff's expert also testified that natural gasoline has certain valuable qualities when added to regular gasoline. Plaintiff testified that in his opinion natural gasoline is worthless and that the value of the blended gas he received was only the value of the percentage of the pipeline gasoline it contained. This opinion hardly squares with the testimony of either expert, and plaintiff admitted that he sold the blended for the same price as the unblended gasoline.

Plaintiff says he learned of the alleged fraud in the first part of 1958

through hired investigators. He testified that he first spoke to his attorney about bringing an action based on it in July 1957; that he again discussed it with the same attorney in September, once later in the fall, and in February 1958; and that in March 1958 he instructed him to bring the suit immediately. Plaintiff testified that he did not inform defendant of the contemplated fraud action on advice of counsel, although during the period prior to the service of the complaint in June 1958 he had been in frequent contact with defendant relative to the balance of $8,804 he owed defendants for gasoline.

After trial of the case with respect only to the issue of fraud, the trial court held that proof of fraud had not been sustained and submitted the case to the jury on a breach of warranty theory. At defendants' request, and over plaintiffs' objection, the court included in its charge Minn. St. 512.49, which provides:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

Defendants by their assignments of error raise the following questions: (1) Whether it was error for the trial court to submit the case to the jury on an unpleaded breach of warranty theory after the case had been pleaded and tried only in fraud and a ruling had been made that fraud had not been proved; (2) whether the required notice was given within a reasonable time under § 512.49, when the buyer waited 12 to 23 months after he knew, or should have known, of the alleged breach of warranty before notifying the seller; (3) whether the damages were excessive as a matter of law when plaintiffs showed that 10 out of 435 sales contained allegedly inferior gasoline, resulting, according to defendants, in maximum damages to plaintiffs of $2,095.84, and the jury returned a verdict (after remittitur) resulting in damages in effect totaling more than $14,500; and (4) whether it was error for the

trial court to refuse to submit a verdict to the jury segregating the amount of defendants' counterclaim from the amount of plaintiffs' damages.

1. In support of defendants' alternative motion for judgment n.o.v. or a new trial, defendants' counsel filed an affidavit which he stated was for the purpose of showing what took place at the discussion between the court and counsel regarding the change from a fraud theory to a breach of warranty theory, the discussion having been informal and not having been recorded. The affidavit contains the following:

"After both sides finally rested, and the case was closed, counsel met with the Court in chambers for the purpose of discussing the instructions to be given. The Court then stated that he would not submit the case to the jury on a fraud theory, because fraud was not sufficiently proven, but that he would submit the case on a breach of warranty theory. I stated that the Court could not do so, and requested a dismissal. Counsel for plaintiffs likewise objected, and requested that the case be submitted on a fraud theory. The Court adhered to his announced position despite the objections from both parties.

\* \* \* \* \*

"There was no statement or suggestion of a breach of warranty theory either by the Court or by counsel for either side until the Court announced, after both sides had rested, that the case would be submitted on a breach of warranty theory rather than on a fraud theory."

Plaintiffs' counsel subsequently made it clear that he did not acquiesce in the court's action by again requesting the court to instruct on the fraud theory.

Since the affidavit submitted by defendants' counsel appears to be undisputed, we are justified in concluding that the trial court acted solely on its own, and without the request of either counsel, when it changed the theory of the case from fraud to breach of warranty upon the close of the evidence. The question presented is, therefore, whether the court's action was justified under the circumstances. Minnesota cases decided prior to our adoption of the Uniform Sales Act in 1917 held such action to be proper. Wilson v. Fuller, 58 Minn. 149, 59

N. W. 988; Brown v. Doyle, 69 Minn. 543, 72 N. W. 814.[1] We have not considered the question since the Uniform Sales Act was enacted.

In the Wilson case the complaint alleged a fraudulent warranty of title. This court held that when a plaintiff sues on a fraud theory but fails to prove fraud, and does prove a breach of warranty, he may recover on the latter theory. It is clear that, at the time the Wilson case and the cases which followed it were decided, the only difference between a fraud action and a breach of warranty action was that in the former proof of scienter was necessary whereas in the latter it was not. See, Barthelemy v. Foley Elev. Co. 141 Minn. 423, 170 N. W. 513.

The rule enunciated in the Wilson case is mentioned in Villaume v. Wilkinson, 209 Minn. 330, 296 N. W. 176, a post-Uniform-Sales-Act case, merely to illustrate the liberal attitude in this state toward the construction of pleadings. The Villaume case is not in point here. Thus, there is no Minnesota case decided subsequent to the passage of the Uniform Sales Act which approves the submission of a case to a jury on a breach of warranty theory when the case has been wholly pleaded and tried on a fraud theory. Our attention has not been called to any cases approving this practice in other jurisdictions where the Uniform Sales Act has been enacted.

Section 49 of the Uniform Sales Act (Minn. St. 512.49) is discussed, together with the reason for its enactment, by Professor Williston in his treatise on sales. 3 Williston, Sales (Rev. ed.) § 484a. The author discusses the hardship imposed upon a seller when a buyer is allowed to assert against the seller at any time within the period of statute of limitations the claim that the goods were defective when received, and comments as follows (p. 38):

"* * * With this in mind the positive requirement of prompt notice was inserted in the statute. * * * In view of the extensive enactment of the Sales Act and the reasonableness of the rule the Restatement of Contracts states it as the law.[2] * * *

---

[1]See, also, Helvetia Copper Co. v. Hart-Parr Co. 137 Minn. 321, 163 N. W. 665; Barthelemy v. Foley Elev. Co. 141 Minn. 423, 170 N. W. 513.

[2]Restatement, Contracts, § 412, provides: "Under a contract for the

"* * * It has been held that the requirement of notice is a condition precedent to the buyer's right and that he must show as a basis of his claim that the terms of the statute have been complied with. The most difficult question of fact that the statute leaves open for discussion is what is a reasonable time for the giving of the notice. Here, as in other cases where a reasonable time must be determined, the question of what is a reasonable time in doubtful cases is for the jury to decide, but may be decided by the court if the facts permit but one conclusion. * * *

"Time is counted not simply from the moment when the buyer knows of the defect, but from the time when he ought to have known it. Prompt exercise of opportunity for discovering defects is, therefore, essential."

The author refers to cases holding that the buyer need not give notice when the breach of warranty applies to defects in title,[3] or when the complaint deals with a deficiency in quantity,[4] as "troublesome."

Plaintiffs contend that notice is not necessary in the case at bar, stating:

"* * * Since defendants knew and were aware of the mixing of the gasoline for delivery to the plaintiff, and were in effect performing a deliberate act, it would be unjust and inequitable to now have defendants claim that they should have received earlier notice of the breach of warranty or promise."

This court has held notice to the seller of the breach to be a condition precedent to recovery for breach of warranty;[5] and that the time in

---

sale of goods, the failure of the buyer, after acceptance of goods tendered as performance of the contract, to give notice to the seller of the latter's breach of any promise or warranty, within a reasonable time after the buyer knows or has reason to know of such breach, discharges the seller's duty to make compensation."

[3]Maxwell Co. v. Southern Ore. Gas Corp. 158 Ore. 168, 74 P. (2d) 594, 75 P. (2d) 9, 114 A. L. R. 697, 706.

[4]Knoxville Sangravel Material Co. v. Dunn, 25 Tenn. App. 93, 151 S. W. (2d) 174.

[5]Mallery v. Northfield Seed Co. 196 Minn. 129, 264 N. W. 573.

which notice had been given was unreasonable as a matter of law.[6] Section 512.49 clearly states that "if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

Section 645.16 states in part:

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. * * *

"When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."

Section 645.22 states:

"Laws uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."

The Minnesota authorities have uniformly required notice to the seller in situations alleging breach of warranty. Some foreign jurisdictions have held certain fact situations where breach of warranty has been alleged not to be within the purview of the Uniform Sales Act. We deem it unwise to carve out a new area of exemption, and therefore hold that, upon the record in this case, it was incumbent upon plaintiffs to give defendants notice of the alleged breach within a reasonable time.

2-3. The question arises whether plaintiffs failed, as a matter of law, to give the notice required by § 512.49 of any alleged breach of warranty within a reasonable time. It does not appear that the essential issue of reasonable notice was ever raised, either before or during the trial. The few facts in the record that relate to notice do so only because they were pertinent to the issue of fraud, the only issue raised by the pleadings.

Defendants contend that, had the breach of warranty theory been

[6]White Pine Lbr. Co. Inc. v. Madsen & Peterson, 166 Minn. 228, 207 N. W. 628; Laundry Service Co. v. Fidelity L. M. & E. Co. Inc. 187 Minn. 180, 245 N. W. 36.

pleaded and been properly in the case, they would have been entitled to a directed verdict because of plaintiffs' failure to give reasonable notice of the claimed breach. Even when considered in the light most favorable to plaintiffs, the record appears to indicate that at least 12 to 23 months elapsed between plaintiffs' actual awareness of any alleged defects and their first notification that they claimed damages (given by commencement of the lawsuit in June 1958).

While this court has not laid down any specific rule as to what constitutes a "reasonable time" for giving notice within the meaning of the statute, it has given several indications as to how long a delay would be considered unreasonable as a matter of law. In White Pine Lbr. Co. Inc. v. Madsen & Peterson, 166 Minn. 228, 229, 207 N. W. 628, 629, this court found that a delay of 43 days after receipt of a shipment of lumber with alleged defects was unreasonable. The notice in that case was "not given within a reasonable time within the spirit and language" of G. S. 1923, § 8423 (now Minn. St. 512.49). In Laundry Service Co. v. Fidelity L. M. & E. Co. Inc. 187 Minn. 180, 245 N. W. 36, a 4½-month delay was unreasonable; in Stewart v. B. R. Menzel & Co. 181 Minn. 347, 232 N. W. 522, a 6-month delay; and in Heibel v. United States Air Conditioning Corp. 206 Minn. 288, 288 N. W. 393, an 8-month delay.

In Bromley v. Morse, 284 Pa. 588, 131 A. 479, an 8-month delay was held unreasonable; in Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984, a 7-month delay; in Lincoln v. Croll, 248 Mass. 232, 142 N. E. 820, an 8-month delay; in Patterson F. & M. Co. v. Williams Lacquer Co. 52 R. I. 149, 158 A. 721, a 6-month delay; in Pierce Foundation Corp. v. Eagle Pipe Supply Co. 180 N. Y. S. 88, a 4-month delay; and in Tegen v. Chapin, 176 Wis. 410, 187 N. W. 185, a 57-day delay. Thus, these cases held that delays ranging from 2 months to a year were unreasonable as a matter of law in attempted recoveries for breach of warranty.

The standard as to the reasonableness of the delay is not changed although the defect may be latent or hidden. The date when the buyer becomes aware or should have become aware of the claimed defect fixes the time from which the delay commences and from which the reason-

ableness or the unreasonableness of the delay must be determined. United States v. American Radiator & Standard Sanitary Corp. (D. Minn.) 115 F. Supp. 422. The defects involved in the American Radiator case were in a sealed conduit, which made them difficult to detect. The plaintiff delayed giving notice of any claimed breach for from 7 to 12 months after discovery. The court held that as a matter of law this was an unreasonable delay, saying that mere uncertainty as to whether there has been a breach does not excuse the giving of prompt notice thereof. According to plaintiff's own testimony in the present case, indications are that he became aware of the possible blending of gasoline with natural gasoline in August 1956.

Plaintiffs cite Federal Oil Co. v. People's Oil Co. 179 Minn. 467, 299 N. W. 575. We held in that case that a buyer of oil having a hidden defect had no duty to assert a breach until the alleged defect was known to him. In that case, however, the evidence showed that the buyer notified the seller as soon as he became aware of the defects through the complaints of his customers. In the instant case one of plaintiffs' own witnesses, a customer, testified that he told plaintiff of the alleged defects in the gasoline early in 1957. Plaintiff did not then notify defendant but said that he became suspicious of the alleged blending in March 1957 and stopped buying from the defendant in November 1957.

We think, under the circumstances, that the delay must be measured at least from April 1957. Since the decision in the People's Oil Co. case established that a buyer need not give notice of a hidden defect until he is, or should be, aware of it, it does not apply here. A delay in notification from 12 to 23 months, apparently established by the record in this case, would be unreasonable as a matter of law when the buyer is aware, or should be aware, of the defect.

4. Another issue and a determinative one deals with the necessity of pleading notice in a breach of warranty case. This court has not heretofore had occasion to pass on this question, though there are numerous decisions in other states and in the Federal courts on this question.

Judge Donovan, in United States v. American Radiator & Standard Sanitary Corp. *supra*, dealt squarely with the issue before us. Plaintiff sued for breaches of implied warranties. Defendant moved to dismiss,

claiming that the complaint did not state a claim because it did not allege timely notice of the purported breaches. The court stated (115 F. Supp. 426) that the "basic issue is whether 'notice' as involved in the controlling statute [§ 512.49], must be pleaded with particularity or whether a mere general pleading will suffice," and concluded:

"Defendants have persuasively argued and cited to the court numerous decisions in support of their contention that 'notice' must appear on the face of the complaint.

"* * * [I]t would appear that the greater weight of authority requires the pleading of 'notice' under the Uniform Sales Statute here in question. * * * even under the most liberal interpretation of the Federal Rules of Civil Procedure, a trial court cannot infer something which has not in fact been pleaded * * *."

In 77 C. J. S., Sales, § 361, it is stated:

"*Notice* of the breach, where notice is necessary, must be alleged to have been given."

See, 77 C. J. S., Sales, § 362e, citing Title Ins. & Trust Co. v. Affiliated Gas Equipment, Inc. 191 Cal. App. (2d) 318, 12 Cal. Rptr. 729; Mack Trucks, Inc. v. Sunde, 19 Wis. (2d) 129, 119 N. W. (2d) 321; Posey Iron Works, Inc. v. Barletta, 46 Luz. Legal Reg. (Pa.) 139; Pritchard v. Liggett & Myers Tobacco Co. (W. D. Pa.) 134 F. Supp. 829.

In Truslow & Fulle, Inc. v. Diamond Bottling Corp. 112 Conn. 181, 151 A. 492, 71 A. L. R. 1142, commented on in 15 Minn. L. Rev. 480, the court held that the notice must be more than a mere complaint and must inform the seller that the buyer claims a breach of some warranty. In the Truslow case plaintiff sold defendant bottle caps for use in bottling and selling beverages. Customers complained of the caps being defective. Plaintiff altered the manufacture of the caps but this failed to remedy the defect. Plaintiff then brought action for goods sold and delivered and defendant filed a counterclaim for damages suffered by reason of the defect in the caps. The trial court found that defendant repeatedly had complained and informed plaintiff of damages resulting from use of the defective caps, and awarded judgment for defendant on both the complaint and the counterclaim. The court on

appeal held that a mere complaint as to quality of goods sold is not sufficient notice of the breach of warranty and ordered a new trial. The court further stated that the notice required by the Uniform Sales Act must apprise the seller that the buyer intends to claim damages for a breach of warranty. We think this construction proper and conclude that the rule applicable to the case at bar is that the buyer must give notice of a breach of any warranty within a reasonable time after he knows or ought to know of such breach.

5. Since notice of breach of warranty was not alleged in this case, we must next look to the pleadings to see if the complaint has in effect been amended by operation of Rule 15.02, Rules of Civil Procedure. The pertinent language of that rule is:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."[7]

The most recent and the principal Minnesota case on amendment of pleadings by express or implied consent is Roberge v. Cambridge Coop. Creamery Co. 243 Minn. 230, 67 N. W. (2d) 400. Plaintiff in that case sought recovery for services rendered, alleging an express contract. The trial court found no express contract and awarded recovery on a quantum meruit basis. The issue presented was whether the reasonable value of plaintiff's services was litigated with the implied consent of the parties. Plaintiff made no move to amend the pleadings to allege an implied contract. A great deal of testimony was introduced bearing on the question of the value of the plaintiff's services, much of which was not objected to as being outside the pleadings. In regard to this testimony this court stated (243 Minn. 234, 67 N. W. [2d] 403):

"* * * The vast majority of this testimony, however, tends with equal force to prove or disprove the existence of an express contract.

---

[7] Rule 15.02, Rules of Civil Procedure, makes no substantial change in the prior law; the first two sentences of the rule supersede the provision of Minn. St. 544.30 as to the amendment of pleadings to conform to the evidence. The rule is the same as Federal Rule 15(b).

It is obvious that consent to try an issue outside the pleadings cannot be implied where the evidence is pertinent to issues actually made by the pleadings."

We also stated (243 Minn. 232, 67 N. W. [2d] 402):

"* * * While pleadings are to be more liberally construed under the new rules of civil procedure, they must still be framed so as to give fair notice of the claim asserted and permit the application of the doctrine of *res judicata.* * * *

* * * * *

"* * * Clearly relief cannot be based on issues that are neither pleaded nor voluntarily litigated.

* * * * *

"* * * Litigation by consent is not to be applied artificially, but rather is to be implied where the novelty of the issues sought to be raised is reasonably apparent and the intent to try these issues is clearly indicated by failure to object or otherwise."

We reversed and remanded in Roberge with leave to plaintiff to move to amend the pleadings. The granting of the motion was left to the discretion of the trial court. The trial court was directed to hear whatever additional evidence was proper to the determination of the issues raised by the amended pleadings and to make findings of fact and conclusions of law accordingly if it chose to permit the amendment.

In this case it is clear that evidence bearing on notice was presented with reference to the issue of fraud and cannot be the basis for inferring that the breach of warranty issue was tried by consent.

6. In Phelps v. Benson, 252 Minn. 457, 476, 90 N. W. (2d) 533, 546, the court stated:

"* * * Under our rules of practice, pleadings do not have the binding force they once had, but they are not meaningless. They still have some purpose in defining the issues to be tried, * * *."

In Gethsemane Lutheran Church v. Zacho, 253 Minn. 469, 481, 92 N. W. (2d) 905, 914, where we found that an issue had been litigated by consent, we said:

"* * * While it would have been better practice if the association had requested permission to amend its pleadings at the commencement of the trial, it seems that all parties understood the issue was to be litigated and that it actually was litigated. Under these circumstances it must be held * * * that the issue was litigated by consent."[8]

Rule 15.02, Rules of Civil Procedure, permits pleadings to be amended to conform to the evidence. In 3 Moore, Federal Practice (2 ed.) § 15.13, p. 846, it is stated:

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, even though there is evidence in the record—introduced as relevant to some other issue—which would support the amendment. This principle is sound, *since it cannot be fairly said that there is any implied consent to try an issue where the parties do not squarely recognize it as an issue in the trial.*" (Italics supplied.)

In Barron and Holtzoff, 1A Federal Practice and Procedure (Rules ed.) § 449, p. 792, the authors make the following statement with regard to Federal Rule 15:

"* * * [F]air notice remains essential, and pleadings will not be deemed amended to conform to the evidence because of a supposed 'implied consent' where the circumstances were such that the other party was not put on notice that a new issue was being raised. Thus where the evidence offered is referable to an issue already in the case, and there is no indication that the party is seeking to raise a new issue, the pleadings will not be deemed amended merely because the evidence would also have been relevant to some other issue not raised by the pleadings."

In the case at bar, counsel for both parties tried the case solely in fraud. While notice is not a necessary element in fraud cases, a plaintiff in a breach of warranty case is precluded from recovery if he does

---

[8]See, also, Alsleben v. Oliver Corp. 254 Minn. 197, 94 N. W. (2d) 354.

not plead and prove the giving of notice within a reasonable time under Minn. St. 512.49. The record is clear that defendants made timely objection to the submission of the case on a breach of warranty theory after both sides had rested, and that plaintiffs joined in the same objection. No one disputes the accuracy of the affidavit filed on that issue and there is no merit to plaintiffs' contention that defendants' objection came too late. Fairness and justice demand that defendant be given a complete opportunity to litigate all relevant issues, and this is particularly true when that element happens to be a condition precedent to plaintiffs' recovery. The record as it now stands establishes that the issue of notice was not pleaded, as required by § 512.49, and that the pleadings were at no time amended by either express or implied consent.

The trial court's finding that fraud was not proved stands unchallenged and cannot be, in the absence of proof as to defendant's intent at the time the agreement was made.

The law in Minnesota on promises which are to commence in the future is enunciated in Wojtkowski v. Peterson, 234 Minn. 63, 69, 47 N. W. (2d) 455, 458, as follows:

"The gist of the fraud is not the failure to perform the promise but the fraudulent intent of the promisor, at the time of making the promise, not to faithfully perform the promise and to deceive the promisee by the false promise. * * *The misrepresentation of his then existing intent to perform must be shown. A subsequent intention to break a promise does not constitute fraud. * * * We are of the opinion that the prevailing rule is that failure to fulfill the promise alone will not authorize the conclusion of fraud. A broken promise does not prove fraud. It must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made."[9]

7-8. Under the Uniform Sales Act the measure of damages for

---

[9]See, also, 1 Bigelow, The Law of Fraud, p. 483.

It would appear that the agreement was not binding on the parties. City of Marshall v. Kalman, 153 Minn. 320, 190 N. W. 597; Trainor v. Buchanan Coal Co. 154 Minn. 204, 191 N. W. 43.

a breach of warranty of quality is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had been as warranted. Minn. St. 512.69(7); 17 Dunnell, Dig. (3 ed.) § 8624; Berry Asphalt Co. v. Apex Oil Products Co. 215 Minn. 198, 9 N. W. (2d) 437.

While plaintiff contends that defendant delivered blended gasoline to him on many occasions, proof to that effect is lacking. Mere suspicion does not supply the necessary proof. According to the record plaintiff established deliveries of blended gasoline in only 10 instances. A calculation submitted by defendant, based on the only established proof of such deliveries, indicates that the maximum damages plaintiffs could have suffered would amount only to $2,095.84. This figure is based upon the assumptions that natural gasoline, although used in all major brands and having a wholesale price of approximately 10½ cents per gallon at the time in question (regular gasoline was 11½ cents per gallon), was worthless, and that all deliveries shown in the calculation were blended with natural gasoline.

We held in Johnson v. Lorraine Park Apts. Inc. 268 Minn. 273, 279, 128 N. W. (2d) 758, 762:

"* * * [W]here there is no evidence, direct or circumstantial, to support an inference any conclusion based thereon becomes merely a conjecture."

The record is clear that all the gasoline which plaintiff bought from the defendant was actually resold at plaintiff's established price. Those facts are hardly conducive to plaintiffs' proving any significant amount of damages. The trial court indicated to the jury that plaintiffs could not recover unless they established "[t]hat certain specific purchases of regular pipeline gasoline were blended with natural gas and certain specific purchases of ethyl gasoline were blended with regular gasoline or natural gasoline." No exception was taken to this instruction by plaintiff. Under the circumstances it has become the law of the case. Knutson v. Lambert, 235 Minn. 328, 336, 51 N. W. (2d) 580, 586.

No verdict for damages can be sustained in a breach of warranty case against the defendant if there has been a failure to comply with the notice requirements of § 512.49. The order appealed from is there-

fore reversed and a new trial granted, with permission to the parties to move for an amendment of pleadings to allege a breach of warranty theory, in order that the issues arising from the notice requirements of § 512.49 may be clearly presented and fully litigated under the applicable provisions of the Uniform Sales Act.

Plaintiffs do not dispute the merits of defendants' contention that it was error for the trial court to refuse to submit a verdict to the jury which would segregate defendants' counterclaim from the amount of plaintiffs' damages. Clearly, defendants are entitled to such instruction in the new trial.

Reversed and new trial granted.

ROGOSHESKE, JUSTICE (concurring specially).

I concur in the result, being of the opinion that our holding should be limited to declaring that the court erred in submitting issues neither pleaded nor litigated by consent upon a theory of liability neither pleaded nor asserted at trial.

OTIS, JUSTICE (concurring specially).

I am in agreement with the concurring opinion of Mr. Justice Rogosheske.